**Beverly A. FINNESETH, Administratrix of the Estate of Norris L. Finneseth, Deceased and Executrix of the Estate of Paul A. Finneseth, Deceased, Plaintiff-Appellant,**

v.

**Charles CARTER, Defendant-Appellee.**

**No. 82–5020.**

United States Court of Appeals, Sixth Circuit.

Argued March 31, 1983.

Decided July 12, 1983.

Rehearing and Rehearing En Banc Denied Oct. 3, 1983.

John E. Wise, Terry Weber, Joseph Hammer (argued), Louisville, Ky., Daniel M. Kininmonth (lead counsel), New Albany, Ind., for plaintiff-appellant.

August A. Klapheke, Louisville, Ky., for defendant-appellee.

Before KEITH, KENNEDY and JONES, Circuit Judges.

CORNELIA G. KENNEDY, Circuit Judge.

Appellant Finneseth appeals from a final order in this action seeking damages in connection with a boating accident dismissing her complaint insofar as it invoked the admiralty jurisdiction of the District Court under 28 U.S.C. § 1333(1); 46 U.S.C. § 740. The remainder of the complaint, predicated upon negligence and invoking the diversity jurisdiction of the District Court, remains before the District Court.

On April 10, 1979, two pleasure craft collided on Dale Hollow Lake killing appellant Finneseth's husband and son. Dale Hollow Lake lies in both Kentucky and Tennessee and was formed when the Army Corps of Engineers constructed a dam on the Obey River. The former riverbed of the Obey River laid entirely in Tennessee. When the dam was erected, however, the reservoir created extended upstream beyond the confluence of the Obey and Wolf Rivers. The former riverbed of the Wolf River meandered back and forth across the Kentucky-Tennessee state line. The reservoir thus has boundaries in both states. The boating accident occurred somewhere above the former riverbed of the Wolf River. It is unclear whether the accident occurred in Kentucky or Tennessee. At present Dale Hollow Lake supports seven to eleven commercial marinas. The only maritime traffic which presently operates on the lake is in the form of pleasure craft. The pleasure craft may traverse the lake between Kentucky and Tennessee but cannot go downstream beyond the dam because the dam is without locks. An official report by the Army Corps of Engineers, made pursuant to its regulatory authority under the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. §§ 401 et seq., indicated that the Obey River was navigable and historically navigated by flatboats, barges, log rafts, loose floating logs and steam and gasoline powered boats carrying minerals, naval stores, agricultural staples and forest products. The report indicated that the Wolf River was also navigable and historically navigated by loose floating logs. The record indicates that in "its present condition the Obey River could support, during all seasons, commercial navigation of the ordinary type ... on Dale Hollow Lake,

which extend[s] from Mile 7.3 to Mile 58.2 on Obey River, Mile 10.0 on East Fork, Mile 6.0 on West Fork, and Mile 16.6 on Wolf River. Navigation on these streams is by recreational craft at present." App. 102, 113, Ex. A, "Determination of Navigability, Obey River and Tributaries."[1] There are presently no restrictions against the use of the lake by individuals exploring for petroleum deposits located near the lake. The possibility of ferry service across the lake between Kentucky and Tennessee was not addressed.

On appellee Carter's motion, the District Court dismissed the complaint to the extent it invoked the court's admiralty jurisdiction on the ground that Dale Hollow Lake was not "navigable" within the meaning of 28 U.S.C. § 1333(1) and 46 U.S.C. § 740. The District Court found the lake to be non-navigable because it is not currently being used as an artery of commerce. Appellant Finneseth appeals this determination.

In *Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), the Supreme Court indicated that the term "navigability," as used in past Supreme Court decisions, has been used to define four separate and distinct concepts: to delineate the boundaries of navigational servitudes; to define the scope of Congress' regulatory authority under the Interstate Commerce Clause; to determine the extent of authority of the Army Corps of Engineers under the Rivers and Harbors Appropriation Act of 1899; and, to establish the

limits of the jurisdiction of the federal courts conferred by Article III, § 2 of the United States Constitution over admiralty and maritime cases. *Id.* 171–72, 100 S.Ct. at 388.

In *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), the Supreme Court set forth the test for admiralty jurisdiction. Admiralty jurisdiction under 28 U.S.C. § 1333(1) and 46 U.S.C. § 740 exists if: (1) the alleged wrongful injury occurred upon navigable waters, and (2) the alleged acts or omissions of the defendants significantly relates to traditional maritime activity. *Id.* 249, 93 S.Ct. at 493. *Accord, Foremost Insurance Co. v. Richardson,* 457 U.S. 668, 673, 102 S.Ct. 2654, 2658, 73 L.Ed.2d 300 (1982). Both appellant Finneseth and appellee Carter agree that the second requirement in *Executive Jet* is met in this case because the collision on Dale Hollow Lake involved the operation of two pleasure craft which may constitute traditional maritime activity. *Foremost Insurance, supra* (collision of two pleasure craft on navigable waters squarely within admiralty jurisdiction). At issue, then, is whether the first requirement, whether the alleged wrongful acts of appellee Carter occurred upon "navigable waters," is met in this case.

In *The Daniel Ball,* 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1871), the Supreme Court stated a definition of navigability for purposes of establishing admiralty jurisdiction.[2]

---

1. In order to have jurisdiction over both the Obey and Wolf Rivers, a necessary prerequisite to the Army Corps of Engineers construction of the dam, both rivers had to be determined navigable under the Rivers and Harbors Appropriation Act of 1899. 33 U.S.C. § 403. The requirement of navigability under that Act and navigability for admiralty jurisdiction are not the same. *See* discussion of *Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979).

2. *Executive Jet* only added a second requirement to the test for admiralty jurisdiction: it did not alter the test of "navigability" set forth by prior Supreme Court precedent in the admiralty context. In *Executive Jet,* the navigability of Lake Erie was assumed; in *Kaiser Aetna* the issue was a definition of navigability for

purposes of imposing a navigational servitude on a Hawaiian fishpond; and in *Foremost Insurance* the navigability of the Amite River in Louisiana was assumed. Subsequent to *Executive Jet,* the Supreme Court has not had the occasion to address the issue of the definition of navigable waters for purposes of admiralty jurisdiction. Although dicta, in *Kaiser Aetna,* the Supreme Court indicated that navigable waters subject to admiralty jurisdiction were defined as including waters that were navigable in fact. *Kaiser Aetna, supra,* 172 n. 7, 100 S.Ct. at 389 n. 7, citing *The Propeller Genesee Chief v. Fitzhugh,* 53 U.S. (12 How.) 443, 13 L.Ed. 1058 (1852) (admiralty jurisdiction). The recent Supreme Court case of *Director, Office of Workers' Compensation Programs, United States Department of Labor v. Perini North River Associates,* —— U.S. ——, 103 S.Ct. 634,

Those rivers must be regarded as public navigable rivers in law which are *navigable in fact*. And they are navigable in fact when they are *used, or are susceptible of being used,* in their ordinary condition, as highways for commerce, over which trade and travel *are or may be conducted* in the *customary* modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the acts of Congress, in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting · with other waters, a *continued highway over which commerce is or may be carried on with other States* or foreign countries in the customary modes in which such commerce is conducted by water (emphasis added).

*Id.* 563. In *The Montello,* 87 U.S. (20 Wall.) 430, 22 L.Ed. 391 (1874), the Supreme Court again addressed the definition of navigability in the admiralty context and stated:

[T]he true test of the navigability of a stream does not depend on the mode by which commerce *is, or may be,* conducted, nor the difficulties attending navigation. * * * The *capability of use* by the public for purposes of transportation and commerce *affords the true criterion of the navigability of a river, rather than the extent and manner of that use.* (emphasis added).

*Id.* 441. Although *The Daniel Ball* defined "navigability in fact" as a water body's susceptibility for use as a highway of commerce in its ordinary condition, subsequent Supreme Court cases in the admiralty context have made it clear that an artificial water body is navigable in fact if it is used or susceptible for use as a highway of commerce. *Ex Parte Boyer,* 109 U.S. 629, 3 S.Ct. 434, 27 L.Ed. 1056 (1884) (Illinois and Michigan Canal); *The Robert W. Parsons,* 191 U.S. 17, 24 S.Ct. 8, 48 L.Ed. 73 (1903) (New York State Barge Canal); *Marine Transit Corp. v. Dreyfus,* 284 U.S. 263, 52 S.Ct. 166, 76 L.Ed. 282 (1932) (New York State Barge Canal). *See also United States v. Appalachian Electric Power Co.,* 311 U.S. 377, 408–09, 61 S.Ct. 291, 299–300, 85 L.Ed. 243 (1940) (applicability of Federal Power Act of 1920 under the Commerce Clause).

■ The principles to be distilled from the above-mentioned Supreme Court cases are that an artificial water body, such as a man-made reservoir, is navigable in fact for purposes of conferring admiralty jurisdiction if it is used or capable or susceptible of being used as an interstate highway for commerce over which trade or travel is or may be conducted in the customary modes of travel on water.

■ In this case Dale Hollow Lake clearly meets the requirement that the lake be an *interstate* highway for commerce because it straddles Kentucky and Tennessee. Because the interstate nexus is satisfied in this manner, it is not probative that maritime traffic on the lake is prevented from traveling downstream by the lockless dam. Two cases cited by appellee Carter, *Chapman v. United States,* 575 F.2d 147 (7th Cir.) (en banc), *cert. denied,* 439 U.S. 893, 99 S.Ct. 251, 58 L.Ed.2d 239 (1978), and *Adams v. Montana Power Co.,* 528 F.2d 437 (9th Cir.1975), are distinguishable from the case on appeal in that the reservoirs created by lockless dams were wholly within the confines of one state. Thus, the threshold requirement that the water body be available as an interstate highway of commerce was not satisfied.

■ Dale Hollow Lake also meets the requirement that it be used or capable or susceptible of being used for any trade or travel that is or may be conducted in the customary modes of trade or travel on water. Because of the liberal definition given to "customary modes of trade and travel on water,"[3] and the fact that Dale

74 L.Ed.2d 465 (1983), addressed the issue of coverage under the Longshoremen's & Harbor Workers' Compensation Act for injuries sustained by workers on navigable waters of the United States. It is not probative of the issue . on appeal.

3. *See, e.g., The Montello,* 87 U.S. (20 Wall.) 430, 440–43, 22 L.Ed. 391 (1874) (Durham boats).

Hollow Lake is currently suitable for maritime traffic by large pleasure craft, there is no evidence before the Court which indicates that Dale Hollow Lake is not susceptible or capable of being used for transportation and commerce between Kentucky and Tennessee, whatever the modes may be. In fact, the only evidence before the District Court regarding the present capability or susceptibility of Dale Hollow Lake for commercial maritime traffic indicates that Dale Hollow Lake can support commercial navigation of the ordinary type during all seasons. App. 102, 113, Ex. A, "Determination of Navigability, Obey River and Tributaries." Fed.R.Civ.P. 50(a); *Coffy v. Multi-County Narcotics Bureau,* 600 F.2d 570, 579 (6th Cir.1979).[4] No Supreme Court case imposes the requirement that navigability only exists, for purposes of admiralty jurisdiction, if the lake or river is currently or presently being used as a highway for interstate commerce. This requirement has been imposed, however, by the Eighth Circuit, despite the contrary language of futurity, such as "susceptibility," "capability," and "may be" conducted or carried on, in early Supreme Court cases. *Livingston v. United States,* 627 F.2d 165 (8th Cir.1980).

In *Livingston,* the Eighth Circuit, relying upon *Chapman* and *Adams,* found a reservoir created by the damming of a river which straddled the states of Arkansas and Missouri to be non-navigable because commercial maritime activity ceased on the river which created the reservoir at the time the dam was constructed. The *Livingston* court held that navigability in admiralty is limited to describing a present capability of the water body to sustain commercial shipping and that admiralty jurisdiction turns on contemporary navigability in fact. *Livingston, supra,* 170. In *Livingston,* the court indicated that because extensions of admiralty jurisdiction have followed the opening of new waters to commercial shipping, it follows that the closing of waters to commercial shipping should likewise have the effect of eliminating admiralty jurisdiction over them. *Id.* 169.

*Livingston* appears to be erroneously decided to the extent that it requires contemporary, current or present commercial maritime activity as a prerequisite for navigability under the admiralty laws because the definition of "navigability in fact" as "susceptible of being used" in *The Daniel Ball* and the criterion of "capability for use" in *The Montello* specifically contradict this requirement. *Accord, Sawczyk v. United States Coast Guard,* 499 F.Supp. 1034 (W.D. N.Y.1980) (lower rapids and whirlpool below Niagara Falls navigable).

The *Livingston* court relied upon the decisions of the Ninth and Seventh Circuits in *Adams* and *Chapman, supra.* This reliance failed to note that in both cases the courts relied not only on the fact that the water-body was not currently used for commercial navigation but also that it was not susceptible of such use in its present state.

*Adams* involved a reservoir existing wholly in the state of Montana, created by the damming of a river which continued below the dam into the Mississippi. The Ninth Circuit held that the river above the lockless dam, which was no longer used for commercial maritime activity after the reservoir was established, was not navigable for purposes of admiralty jurisdiction, even

---

**4.** The report of the Army Corps of Engineers, made pursuant to its regulatory authority under the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 401 *et seq.,* also provides evidence of the navigability of Dale Hollow Lake at the point of the Wolf River. We are mindful that the *Kaiser Aetna* Court was clear to point out that meeting the definition of navigability under one of the four uses of "navigability" was not dispositive of meeting each of the other definitions. *Id.* 444 U.S. 172–73, 100 S.Ct. at 388–89. Although determinations by the Army Corps of Engineers, the Coast Guard, or the courts, with respect to navigability under the Rivers and Harbors Appropriation Act of 1899 or the Commerce Clause, are not controlling in a navigability determination for admiralty jurisdiction, they are not without significance and may be taken into account by a court in determining whether a water body is navigable. *See United States v. Oregon,* 295 U.S. 1, 23–24, 55 S.Ct. 610, 619, 79 L.Ed. 1267 (1935); *Sawczyk v. United States Coast Guard,* 499 F.Supp. 1034, 1039 (W.D.N.Y.1980).

though it would have been navigable under the Commerce Clause. The *Adams* court observed that, absent some present or *potential* commercial maritime activity, there was no justifiable federal interest for finding federal admiralty jurisdiction. *Adams, supra,* 439–40. It recognized that the test of navigability is whether the waterway "is used or *susceptible* of being used as an artery of commerce." (emphasis added) *Id.* 439. The *Adams* court confused, however, the two requirements of *Executive Jet,* merged them together and found that the operation of pleasure craft does not affect commercial maritime activity—a position which was squarely rejected by the Supreme Court in the recent case of *Foremost Insurance. See Adams, supra,* 439.

*Chapman* involved an accident on the Kankakee River in Illinois. Although the river continued into the Mississippi, at the point it was dammed it was wholly in the state of Illinois. No commercial maritime activity took place on the Kankakee River above the lockless dam after its erection in 1931. Since that time, the river has been solely used for recreational purposes. The *Chapman* court determined that it was unusable and held that a recreational boating accident does not give rise to a claim within the admiralty jurisdiction of the federal courts when it occurs on waters which are not in fact currently used for commercial maritime activity and are not susceptible of such use in their present state. *Chapman, supra,* 151. Thus, neither *Chapman* nor *Adams* mandates that there be present usage. Both permit consideration of whether the river or reservoir is susceptible of such use as well. In *Chapman,* there is also the implication that the Kankakee River is unusable for some reason pertaining to the physical characteristics of the water body itself, rather than the practical realities or economics of future commercial activity.

All three courts state that no federal interest is served by asserting admiralty jurisdiction where there is presently or currently no commercial maritime activity ongoing. In *Foremost Insurance,* the Supreme Court found admiralty jurisdiction where a complaint alleged a collision between two pleasure boats on navigable waters. The Court found no requirement that the maritime activity giving rise to admiralty jurisdiction be exclusively commercial. The *Foremost Insurance* Court based its decision on the breadth of the federal interest in protecting maritime commerce, stressing the need for uniform rules to govern conduct and liability, the potential impact on maritime commerce when two vessels collide on navigable waters, and the uncertainty that would necessarily accompany a jurisdictional test tied to the commercial or noncommercial use of a given boat. *Foremost Insurance, supra,* 457 U.S. 668, 674–75, 102 S.Ct. at 2658–59. Because of these same broad federal interests, there can be no requirement that commercial maritime activity be presently or currently engaged in on a particular water body before admiralty jurisdiction may attach where that water body is susceptible to or capable of being used as an interstate highway of commerce over which trade or travel may be conducted in the customary modes of travel upon water. The concern of the *Foremost Insurance* Court with the potential, rather than actual, impact on maritime commerce by pleasure craft suggests that federal interests in protecting maritime commerce extend to creating a climate conducive to commercial maritime activity on water bodies which are not presently or currently being used as interstate highways of commerce but are susceptible to or capable of such use.

■ Finding admiralty jurisdiction in a case, such as *Livingston* and the case on appeal, where the water bodies are potential interstate highways of commerce because they are susceptible to or capable of such use, serves the purpose of making uniform rules of conduct, including the navigational rules, "Rules of the Road," light requirements, etc., applicable to all interstate maritime traffic, whether commercial or pleasure. Having uniform rules in place is conducive to commercial maritime activity because commercial maritime activity could begin on such a water body, despite its prior absence or a hiatus in activity, without pro-

viding notice to the pleasure boating public of a change in rules and conduct. Conversely, pleasure boaters would operate under uniform rules of conduct and liability without regard to commercial caprice or economic whim. Otherwise, reservoirs such as Dale Hollow Lake, which are clearly interstate, would be subject to either federal or state rules of conduct and liability, which may differ radically from one another, depending on the coincidence of whether commercial maritime activity is currently or presently being engaged in at the time of any tortious occurrence. For example, if current or present commercial maritime activity is the test, a ferry could operate on Dale Hollow Lake between Kentucky and Tennessee one day and go out of business the next and tortious occurrences happening on each of the two days would be subject to different rules of conduct and liability. This addition or subtraction of commercial maritime traffic on Dale Hollow Lake would require that all pleasure boat operators suddenly change their rules of conduct and liability from federal to state or vice versa causing great uncertainty and confusion. In addition, interstate maritime activity is by definition not local. A scattering of states applying their own parochial rules of law could lead to inconsistent rules of conduct depending on a pleasure boater's precise location within the territorial jurisdiction of one state or another and inconsistent rules of liability depending on the location of a tortious occurrence. Uniform, stable and in-place rules of maritime conduct and liability would eliminate difficulties in determining which state's law applies in cases such as the one on appeal where the precise location of the accident is unknown. They would preclude the possibility of inconsistent findings or the denial of jurisdiction or a cause of action in any state forum and eliminate the specter of parallel or conflicting rules attending interstate pleasure boaters who cross state lines. All of these considerations support a federal interest in protecting interstate commerce by creating a climate conducive to commercial maritime activity where a water body is susceptible or capable of being used as an interstate highway of commerce.

 Because Dale Hollow Lake is an interstate water body susceptible or capable of being used as an interstate highway of commerce, even though it is not presently so used, it meets the Supreme Court's requirements for navigability for admiralty jurisdiction under 28 U.S.C. § 1333(1) and 46 U.S.C. § 740. Accordingly, the decision of the District Court is reversed and the case remanded for further proceedings consistent with this opinion.