James Michael WILDER

v.

PLACID OIL COMPANY.

Richard SANDERS

v.

PLACID OIL COMPANY.

Civ. A. Nos. 83–1790, 83–1915.

United States District Court,
W.D. Louisiana,
Alexandria Division.

June 20, 1985.

Wilbert J. Saucier, Jr., Pineville, La., for James Michael Wilder.

Gravel & Brady, James J. Brady, Alexandria, La., for Richard Sanders.

Abbott, Webb, Best & Meeks, John P. Napolitano, Laurence E. Best, New Orleans, La., for Placid Oil Co. in No. 83–1790.

Herbert & Abbott, Laurence E. Best, New Orleans, La., for Placid Oil Co. in No. 83–1915.

## RULING

LITTLE, District Judge.

The issue pending before this Court is whether Catahoula Lake, a low lying portion of the Little River in the State of Louisiana, is navigable for purposes of admiralty jurisdiction. The matter has been briefed by the parties and presented by way of cross-motions for summary judgment. Having previously denied defendant's motion in a Ruling dated 5 June 1985, and having further received the benefit of defendant's *profert in curia* on this point and the full trial hearing of this matter, the Court hereby grants plaintiffs' motion and assigns the following reasons.

## FACTS

These consolidated actions were instituted by Richard Sanders and James Michael Wilder against Placid Oil Company to recover damages for personal injuries and property loss allegedly sustained when Wil-

der's 15-foot outboard aluminum boat, in which both complainants were riding, struck a steel well-head casing pipe allegedly owned and maintained by Placid. According to the plaintiffs' pleadings, the pipe was submerged and was not marked. The actions were originally brought pursuant to the admiralty maritime jurisdiction of the Court, 28 U.S.C. § 1333 and designated under Fed.R.Civ.P. 9(h). Both plaintiffs subsequently filed amended complaints alleging diversity of citizenship pursuant to 28 U.S.C. § 1332 as an alternative basis of jurisdiction.

The uncontroverted material submitted by the parties indicates that the Little River is formed by the meeting of the Dudgdemona River and Bayou Castor just to the northeast of Rochelle, Louisiana. It flows in a more or less southerly direction into the lowlands which become Catahoula Lake in high water. From Catahoula Lake the water is discharged through several tributaries and distributaries until the tributaries finally rejoin into one channel at Archie, Louisiana. One such distributary is a diversion canal built by the U.S. Army Corps of Engineers and completed in May of 1972. This canal has a permanent dam structure across it which forecloses navigation except during flood stages. At Archie, the Corps has fabricated a weir across the span of the Little River. The weir, completed in June of 1973, is constructed out of concrete and crests at an elevation of 36 feet above sea level or 36 NGVD (National Geodetic Vertical Data). This keeps the water level at 36 NGVD from the outflow of the lake up to the structure itself. The water level of the lake is controlled by movable gates in the permanent dam in the diversion canal. Thus, when the water level of the Little River is higher than 36 NGVD, vessels may pass over the weir. The weir, while permanent, is not a total obstruction to navigation.

From Archie, Louisiana the water flows easterly to Jonesville and Trinity, Louisiana, where it joins the Ouachita and Tensas Rivers to form the Black River. The Black then runs into the Red River which in turn runs into either the Atchafalaya River, from which one may enter the Gulf Intracoastal Canal or the Lower Old River, which allows passage into the Mississippi River. A steady, if not substantial barge trade is conducted on the Atchafalaya, Black and Red Rivers, while the Mississippi River is a major maritime commercial artery. Accordingly, these waters form a continuous highway between states over which commerce may be conducted.

In 1887, the Little River was navigated by steamboat from White Sulphur Springs, Louisiana above Catahoula Lake, to its end at Jonesville, Louisiana. *1887 Ann. Rep. of the Chief of Engineers*, Part II at 1499. The business on the river consisted of logging, fur trading and transportation of bales of cotton. *Id.*

The Little River, including Catahoula Lake, is a navigable waterway of the United States for the purposes of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 401 *et. seq.* In 1932, the Corps listed the Little River as being navigable from its mouth at Jonesville to mile 82.8 at the Missouri-Pacific Railroad bridge. Currently the Corps limits its jurisdiction to mile 55.

By affidavit, Thomas William Coon testified that he piloted the MISS FLORENCE, a self-propelled barge measuring approximately $35 \times 110$ feet with a draft of 3 feet when empty, throughout Catahoula Lake from 1966 to 1979, and that on one occasion he piloted this vessel from Catahoula Lake through the system of waters described above to Orange, Texas. He also testified that he has been a passenger on crew boats as large as 40 feet in length which have passed into the Black River system from Catahoula Lake navigating over the weir at Archie, Louisiana, on several occasions.

Julian Wesley Thompson, age 46, has lived close to Catahoula Lake all his life. From 1957 through 1970 he operated the MISS FLORENCE and another self-propelled barge known as Barge No. 259 on the Little River and in Catahoula Lake. Barge No. 259 is approximately $40 \times 200$ feet. He personally piloted the MISS

FLORENCE from Buffalo Bayou in the State of Mississippi to Catahoula Lake. He has also personally witnessed the passing of 40-foot crew boats over the weir at Archie, Louisiana. The last such crossing he witnessed was in May of 1985.

Vernie A. Gibson, born in 1914, is a life-long resident of LaSalle Parish, Louisiana and has spent those years in close proximity to Catahoula Lake. He has worked portions of Catahoula Lake, Little River, Old River, Black River, Ouachita River, Atchafalaya River and the Mississippi River as a commercial fisherman and fur trapper since 1933. He remembers the days of steamboat traffic from the Lake to the Black River. He has personally navigated vessels of 5½ to 6 foot drafts over the weir at Archie, Louisiana, and has done so as recently as 1982.

For many years, including 1984 and 1985, Placid has operated crew boats, work boats, self-propelled barges and drilling barges on the Little River and in Catahoula Lake. The record is replete with photographs as recent as 1984 of those vessels in active navigation.

Navigation in Catahoula Lake and on Little River occurs all year round. Navigation over the weir is seasonal.

Historically (1933 to 1967), the water level of the river has been above 36 NGVD from January through July with occasional instances in August, November and December. The highest level recorded was 59.41 NGVD on May 16, 1973. The lowest level was 20.89 NGVD on October 23, 1976. According to the record, navigation over the weir was possible during January-June of 1984; January-July and December of 1983; June and December of 1982; June of 1981; March-June of 1980; January-July of 1979; April-June of 1978; and March-May of 1977–1981 and 1982 were drought years. Plaintiffs were injured in January of 1983. Navigation over the weir was possible at that time.

## LAW

Admiralty and maritime jurisdiction extends to all navigable waters within the United States. 28 U.S.C. § 1333; 46 U.S.C. § 740; see e.g., Southern S.S. Co. v. N.L. R.B., 316 U.S. 31, 41, 62 S.Ct. 886, 891–92, 86 L.Ed. 1246, 1256 (1942). Plaintiffs contend that because the Corps finds Little River a navigable water of the United States under the Rivers and Harbors Act, it is also a navigable water of the United States for purposes of admiralty jurisdiction.

■ "In *Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979), the Supreme Court indicated that the term 'navigability', as used in past Supreme Court decisions has been used to define four separate and distinct concepts: to delineate the boundaries of navigational servitudes; to define the scope of Congress' regulatory authority under the Interstate Commerce Clause; to determine the extent of authority of the Army Corps of Engineers under the Rivers and Harbors Appropriation Act of 1899; and, to establish the limits of the jurisdiction of the federal courts conferred by Article 111, Section 2 of the United States Constitution over admiralty and maritime cases." *Finneseth v. Carter,* 712 F.2d 1041, 1043 (6th Cir.1983); *Kaiser Aetna v. United States,* 444 U.S. at 171–72, 100 S.Ct. at 388, 62 L.Ed.2d at 340–41. Thus, the fact that the Little River is a navigable water for the purposes of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 401, *et. seq.,* is not dispositive in this case since the requirement of navigability under that Act and navigability for admiralty jurisdiction are not the same. *Finneseth,* 712 F.2d at 1043 n. 1; *see* discussion in *Kaiser-Aetna, supra.*

■ In *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), the Supreme Court set forth the test for admiralty tort jurisdiction. Admiralty tort jurisdiction under 28 U.S.C. § 1333(1) and 46 U.S.C. § 740 exists if: (1) the alleged wrongful injury occurred upon navigable waters, and (2) the alleged acts or omissions of the defendant significantly relates to traditional mari-

time activity. *Id. Accord, Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 673, 102 S.Ct. 2654, 2658, 73 L.Ed.2d 300, 305 (1982).

In *Foremost,* the Supreme Court held that the collision of two pleasure boats on navigable waters falls within admiralty jurisdiction. 457 U.S. at 674 and 676, 102 S.Ct. 2654, 73 L.Ed.2d at 306 and 307. The Court rejected a requirement that the wrong had to involve maritime commerce in order for it to have a significant connection with traditional maritime activities. *Id.* Instead, the Court emphasized the navigational aspect of the *Executive Jet* test. 457 U.S. at 675 n. 5, 102 S.Ct. 2654, 73 L.Ed.2d at 306 and note n. 5. A host of lower courts have found pleasure craft accidents within the periphery of admiralty jurisdiction. *See, e.g., Oliver By Oliver v. Hardesty,* 745 F.2d 317 (4th Cir.1984) (19-foot pleasure craft); *Finneseth v. Carter, supra* (two pleasure craft); *Kelly v. U.S.,* 531 F.2d 1144 (2nd Cir.1976) (19-foot sailboat); *Richards v. Blake Builders Supply Co., Inc.,* 528 F.2d 745 (4th Cir.1975) (18-foot motorboat and 20-foot motorboat); *St. Hilaire Moye v. Henderson,* 496 F.2d 973 (8th Cir.1974), *cert. denied,* 419 U.S. 884, 95 S.Ct. 151, 42 L.Ed.2d 125 (1974) (18-foot motorboat); *Kelly v. Smith,* 485 F.2d 520 (5th Cir.1973) (15-foot outboard motorboat); *Respess v. U.S.,* 586 F.Supp. 861 (E.D.La. 1984) (17-foot outboard motorboat); *Hartman v. United States,* 522 F.Supp. 114 (D.S.C.1981) (speedboat); *Armour v. Gradler,* 448 F.Supp. 741 (W.D.Pa.1978) (30-foot fishing cruiser); *Spiller v. Lowe,* 328 F.Supp. 54 (W.D.Ark.1971) (16-foot aluminum flat-bottomed boat); *Madole v. Johnson,* 241 F.Supp. 379 (W.D.La.1965) (motorboat). Recently, one appellate panel has found otherwise. *See, Souther v. Thompson,* 754 F.2d 151 (4th Cir.1985) (motor ski boat).

■ In *Souther, supra,* the Fourth Circuit seems to limit the inclusion of pleasure craft in admiralty jurisdiction to cases where an alleged navigational error by the craft itself causes the injury. 754 F.2d at 153. This Court believes this is too narrow a reading of *Foremost.* Collision cases, where two vessels impact, and allision cases, where one vessel impacts with a stationary object, are an important and integral part of admiralty law. *See, generally,* G. Gilmore and C. Black, *The Law of Admiralty,* Ch. VII, pp. 485–531 (2d ed. 1975). The Court finds that an allision with some allegedly negligently placed navigational obstruction, such as this case, is clearly encompassed within the term "maritime activities" as used in *Foremost.* At issue, then, is whether the first requirement of the *Executive Jet* test has been met: i.e., whether the alleged wrongful action of Placid caused injury upon "navigable waters".

■ "Navigable water" subject to admiralty jurisdiction is defined as including waters that are navigable in fact. *The Propeller Genesee Chief v. Fitzhugh,* 12 How. 443, 13 L.Ed. 1058 (1852). *See also, e.g., The Belfast,* 7 Wall. 624, 19 L.Ed. 266 (1869). This includes man-made or artificial bodies of water. *Ex Parte Boyer,* 109 U.S. 629, 3 S.Ct. 434, 27 L.Ed. 1056 (1884); *The Robert W. Parsons,* 191 U.S. 17, 24 S.Ct. 8, 48 L.Ed. 73 (1903); *Marine Transit Corp. v. Dreyfus,* 284 U.S. 263, 52 S.Ct. 166, 76 L.Ed. 282 (1932).

At this juncture the Court is hard-pressed to find a definition of "navigable in fact" for purposes of admiralty jurisdiction. Legions of lower courts have cited the time-honored cases of *The Daniel Ball,* 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1871) and *The Montello,* 87 U.S. (20 Wall.) 430, 22 L.Ed. 391 as including the Supreme Court's definition of this term for admiralty jurisdiction. Indeed, *Ex Parte Boyer* tells us that *The Daniel Ball* and *The Montello* "extended the salutary views of admiralty jurisdiction applied in *The Genesee Chief*". 109 U.S. at 631–32, 27 L.Ed. at 1057. But in *Kaiser Aetna v. U.S.,* the Supreme Court cites those same cases for the definition of "navigable waters" within the boundaries of "Congress' regulatory authority under the Commerce Clause". 444 U.S. at 172, 100 S.Ct. 383, 62 L.Ed.2d at 341. This is the Court's dilemma: How can we follow *Ex Parte Boyer* without doing harm to *Kaiser Aetna* since admiralty jur-

isdiction and jurisdiction under the Commerce Clause are separate and distinct?

■ In *The Genesee Chief*, the Supreme Court spoke repeatedly of the substantial amount of commerce conducted on the inland rivers and great lakes of this country and of how it was as rich as that conducted on the high seas. 12 How. at 457, 13 L.Ed. at 1064. It stands to reason that such commerce played an integral part in the court's extention of admiralty jurisdiction beyond the ebb and flow of the tide. Accordingly, in *The Steamboat Ad. Hine v. Trevor*, 71 U.S. (4 Wall.) 555, 18 L.Ed. 451 (1867), the Supreme Court stated that *The Genesee Chief* extended admiralty jurisdiction to "wherever ships float and navigation successfully aids commerce". 71 U.S. at 563, 18 L.Ed. at 453–54. Finally, in *Ex Parte Boyer*, it was held:

> "Navigable water situated as this (Erie) canal is used for the purposes for which it is used, a highway for commerce between ports and places in different states, carried on by vessels such as those in question here (horse drawn barges), is public water of the United States, and within the legitimate scope of the admiralty jurisdiction conferred by the Constitution and statutes of the United States, even though the canal is wholly artificial, and is wholly within the body of a state, and subject to its ownership and control; and it makes no difference as to the jurisdiction of the district court that one or the other of the vessels was at the time of the collision on a voyage from one place in the state ... to another place in that state."

109 U.S. at 632, 3 S.Ct. 434, 27 L.Ed. at 1057. *See, also, The Belfast*, 74 U.S. (7 Wall.) 624, 19 L.Ed. 266 (1869). Thus, it appears that even if *The Daniel Ball* is a "separately distinct" Commerce Clause case, the cases cited above show that its definitions of "navigable waters" and waters "navigable in fact" are still appropriate for actions in admiralty:

> "Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water."

77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999, 1001 (1870). The Court can discern little difference between these definitions and the tenets extracted from *Ex Parte Boyer* above.

■ Placid Oil Company and at least one of its subdivisions explore for minerals in Catahoula Lake. According to the evidence, it has navigated crew boats over the weir at Archie, Louisiana to aid this exploration. The evidence also shows that at least one commercial fisherman has done the same in aid of his business. There is also evidence that part of this commerce has been conducted between states.

Defendant argues that if there is commerce on the Little River, it is not enough to support jurisdiction. Defendant does not deny its own transportation and drilling barge activities in that area. It has not rebutted Mr. Gibson's testimony. We think the amount of commerce is sufficient. *See, Respess v. U.S.*, 586 F.Supp. at 864 (commercial fishing); *Cf., Pippen v. Shell Oil Co.*, 661 F.2d 378, 384 (5th Cir.1981) (offshore drilling is maritime commerce). *But see, Herb's Welding, Inc. v. Gray*, 470 U.S. ——, 105 S.Ct. 1421, 84 L.Ed.2d 406 (1985) (welder working on a *fixed* offshore oil drilling platform in state territorial waters held not engaged in maritime employment for purposes of the LHWCA, 33 U.S.C. §§ 901 *et seq.*).

■ It is also relevant that the Army Corps of Engineers holds the Little River and Catahoula Lake as navigable waters of the United States, maintains structures throughout the system at issue in this case and deems it necessary that Placid obtain a permit which governs the placing of structures in those waters in order to conduct their exploration. These determinations are not controlling, *see, Kaiser Aetna v. U.S., supra*, but from an evidentiary point of view they are not without significance and may be taken into account. *Finneseth*

*v. Carter,* 712 F.2d at 1045 n. 4; *Hartman v. U.S.,* 522 F.Supp. 114, 117 (D.S.C.1981); *Sawczyk v. U.S.C.G.,* 499 F.Supp. 1034, 1039 (W.D.N.Y.1980); *see also, United States v. Oregon,* 295 U.S. 1, 23–24, 55 S.Ct. 610, 619, 79 L.Ed. 1267, 1278–79 (1935). The Court is also cognizant of the fact that Congress has declared that all the navigable rivers and waters in the former territories of Orleans and Louisiana shall be and forever remain public highways, 33 U.S.C. § 10, and accords that statement the weight it deserves.

Further, it is interesting to speculate that if the boat had caused injury in this case, plaintiffs might very well have petitioned this Court for limitation of liability. *See,* 46 U.S.C. § 188 (limitation applies to all vessels used on lakes or rivers or in inland navigation); *see generally,* Herman, *Limitation of Liability for Pleasure Craft,* 14 J.Mar.Law & Com. 417 (1983). In any event, the Court has no doubt that vessel navigation on the Little River is governed by the Inland Navigational Rules, 33 U.S.C. §§ 2001, *et seq.* and that both above statutes are traditionally applied in admiralty. To draw the line for admiralty jurisdiction at the weir in Archie, as defendant would have us do, could only lead to confusion. The above statutes would then apply to boats downriver from the weir but not those upriver, even when the water is above 36 NGVD and conducive to through navigation. This we cannot do.

Defendant finally argues that the seasonal navigability over the weir renders the Little River above the weir and Catahoula Lake non-navigable. This argument also has no merit. Many rivers have portions of their waters which are impassable at certain times of the year. The upper Mississippi and the Saint Lawrence Seaway are examples of rivers that freeze during the winter months. Does this make those waters any less "navigable waters" for purposes of admiralty jurisdiction? We think not.

At this point, a quote from the appellate decision in *Foremost* is appropriate:

"We note additionally from the record that the place where the accident occurred (Amite River) is seldom, if ever, used for commercial activity. That does not cause us to vary from our holding. The waterway is not landlocked. It would be introducing another note of uncertainty to hold that admiralty jurisdiction extends only to a stretch of navigable water that presently functions as a commercial artery. Jurisdiction should be as readily ascertainable as courts can make it. If the waterway is capable of being used in commerce, that is a sufficient threshold to invoke admiralty jurisdiction."

*Richardson v. Foremost Ins. Co.,* 641 F.2d 314, 316 (5th Cir.1981), *aff'd. sub nom. Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300, *rehearing denied,* 459 U.S. 899, 103 S.Ct. 198, 74 L.Ed.2d 160 (1982). The Little River, including Catahoula Lake, is neither landlocked nor incapable of commerce. The Court finds the accident involved in this case is within its admiralty jurisdiction. The cases of *Adams v. Montana Power Co.,* 528 F.2d 437 (9th Cir.1975) (completely obstructed portion of Missouri River); *Chapman v. U.S.,* 575 F.2d 147 (7th Cir. 1978) (Kankakee River found not usable for commerce); *Livingston v. U.S.,* 627 F.2d 165 (8th Cir.1980) (Norfork River obstructed and incapable of commerce); *Edwards v. Hurtel,* 717 F.2d 1204 (8th Cir.1983) (Table Rock Lake found not susceptible of use for commerce); *Land and Lake Tours, Inc. v. Lewis,* 738 F.2d 961 (8th Cir.1984) (Lake Hamilton obstructed by two dams found non-navigable under admiralty jurisdiction); *Dunham v. DeMaine,* 559 F.Supp. 224 (E.D.Ark.1983) (Lake Hamilton, *supra*); and *Smith v. Hustler, Inc.,* 514 F.Supp. 1265 (W.D.La.1981) (Lake Bistineau obstructed by dam found incapable of commerce) are inapposite. Plaintiffs' motion is GRANTED.