**Debra S. LYNCH, Plaintiff,**

v.

**Charles L. McFARLAND and Betty J. McFarland, Defendants.**

**Civ. A. No. C90–0020 BG.**

United States District Court, W.D. Kentucky, at Bowling Green.

Dec. 16, 1992.

Michael J. Fusco, Westerville, OH, Douglas Brandon, Lexington, KY, for plaintiff.

Robert Bertram, Bertram & Wilson, Jamestown, KY, Reginald L. Ayers, Bell, Orr, Ayers and Moore, Bowling Green, KY, for defendants.

## MEMORANDUM OPINION

HEYBURN, District Judge.

This matter comes before the Court upon Defendants' Motion to Set Aside the Court's Order dated October 10, 1992, pursuant to Rule 60 of the Federal Rules of Civil Procedure, due to the Court's adoption of the Magistrate's Findings of Fact, Conclusions of Law and Recommendation without considering Defendants' objections

thereto. The Court has now considered those objections and has reviewed de novo the Magistrate's recommendation to exercise admiralty jurisdiction pursuant to 46 U.S.C.App. § 740.

This is a personal injury action in which Plaintiff alleges that she was injured in a boating accident caused by the negligence of Defendant, Charles McFarland, and Defendant, Betty McFarland. At the time of the accident, Plaintiff was a passenger in an 18–foot speed boat owned by Charles McFarland and which was being operated on Lake Cumberland by Defendant, Betty McFarland. Defendants urge dismissal of the Complaint for the reason that the exercise of admiralty jurisdiction in this case is not proper.

### I.

■ To determine whether an alleged tort is "maritime" and thus within the admiralty jurisdiction of the federal courts, this Court must find that the wrong (1) occurred upon navigable waters and (2) bears significant relationship to traditional maritime activity. *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972). Because the tort alleged in this case arose out of a boating accident, the Court will presume a sufficient maritime relationship. *See Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982).[1] The more direct and pressing issue before the Court is, instead, whether Lake Cumberland constitutes navigable waters as defined in admiralty jurisprudence. No Circuit has yet addressed this issue and whether Lake Cumberland is a maritime locality is a matter of first impression before the district courts, as well.

The essential facts bearing upon the navigability issue have been established by the testimony of Thomas M. Wilkerson who is an employee of the United States Corps of Engineers at Lake Cumberland, Kentucky. In his deposition, Mr. Wilkerson states emphatically that boats and vessels cannot navigate out of Lake Cumberland despite the fact that, in Mr. Wilkerson's words, the lake "backs up into the Big South Fork of the Cumberland River which has flowed north from Tennessee." In his affidavit, Mr. Wilkerson asserts that certain boating activity does take place on the Cumberland River (¶ 2); that visitors from a variety of different regions and states travel (but not by boat) to Lake Cumberland to enjoy those activities (¶ 3); and that the Big South Fork of the Cumberland River flows northward from Tennessee into Kentucky, there, uniting the Big South Fork with the main branch of the Cumberland River, known as the North Fork, at Burnside, Kentucky (¶ 4).

At the time of his deposition, Mr. Wilkerson considered only whether boating traffic could proceed beyond the Wolf Creek dam at the west end of Lake Cumberland or proceed beyond Cumberland Falls at the east end of the lake. Mr. Wilkerson concluded that the lake was landlocked at both ends. However, Mr. Wilkerson later states in his affidavit that the "commercial activity that takes place on the Big South Fork includes the renting of canoes and rafts for navigation across the Tennessee–Kentucky border and down the free flowing river" (¶ 5). Mr. Wilkerson's use of the term "commercial activity" is his own and first appears in his affidavit. Mr. Wilkerson's deposition testimony did not reveal that the length of the Big South Fork is susceptible to canoeing and rafting. Indeed, in his affidavit Mr. Wilkerson is somewhat evasive about the "commercial activity" that joins Lake Cumberland and Tennessee.

Notwithstanding the affiant's hedging, the Court will assume for purposes of this motion that a limited amount of canoeing or rafting may occur from Tennessee along the Big South Fork River into Kentucky and ultimately into Lake Cumberland. The record contains no suggestion that larger

---

1. In *Foremost,* the Court determined that an accident involving pleasure boats can confer admiralty jurisdiction because such an accident on the Louisiana River could significantly impact traditional maritime activity. It could be argued persuasively that pleasure boat activity on Lake Cumberland does not significantly impact traditional maritime activity and is certainly not of an interstate nature.

pleasure boats or motor powered craft can pass along the Big South Fork River between Tennessee and Kentucky, nor does the record support any further conclusions regarding commercial or pleasure boat traffic.

Boiled down to its essentials, this Court must resolve the issue whether travel, limited to canoeing and rafting, up the Big South Fork River from Tennessee to Kentucky and then into Lake Cumberland is sufficient for purposes of conferring admiralty jurisdiction. This case, indeed, presents a unique factual situation, and absent the guidance of even persuasive authority that addresses these facts, this Court must consider the important threshold question about the parameters of admiralty jurisdiction: what kind of traffic must occur between two states in order to make a waterway navigable in interstate commerce for purposes of conferring admiralty jurisdiction.

## II.

Taken together, *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1870); *The Montello*, 87 U.S. (20 Wall.) 430, 22 L.Ed. 391 (1874); *Finneseth v. Carter*, 712 F.2d 1041 (6th Cir.1983), and *Adams v. Montana Power Co.*, 528 F.2d 437 (9th Cir. 1975) form the framework within which the Court will analyze the facts of this case to determine whether this Court can maintain admiralty jurisdiction.

In *The Daniel Ball* case, the Supreme Court had its first occasion to define the standard for navigability as follows:

"Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. And they constitute navigable waters of the United States within the meaning of the acts of Congress in contradistinction from the navigable waters of the states, when they form in their ordinary condition by themselves, *or by uniting with other waters in continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water.*" (Emphasis added.)

*The Daniel Ball*, 77 U.S. (10 Wall.) at 563.

In *Adams*, the Ninth Circuit addressed the limited issue of whether noncommercial, pleasure boating or other recreational boating constitutes "commerce" as that term is used in admiralty jurisprudence. 528 F.2d 437. In *Adams*, the alleged accident occurred on a 25–mile stretch of the Missouri River which is completely obstructed by the Hauser Dam at one end and by the Holter Dam at the other end. The body of water in between the two dams is completely within the state of Montana. The court noted that although the river in its natural condition may have been a maritime locality, the mere operation of pleasure craft, where interstate commerce is now an impossibility, did not make the water navigable for purposes of conferring admiralty jurisdiction. Therefore, the court found that where a water way is navigable *only* by noncommercial fishermen, boaters, water skiers and pleasure boaters, then the water way is not navigable for purposes of exercising admiralty jurisdiction.

The case of *Finneseth* is pertinent principally because it defines when an artificial body of water is navigable for purposes of conferring admiralty jurisdiction. The standard as set forth by the Sixth Circuit is:

"An artificial water body, such as a man-made reservoir, is navigable in fact for purposes of conferring admiralty jurisdiction if it is used or capable or susceptible of being used as an interstate highway for commerce over which trade or travel is or may be conducted in customary modes of travel on water."

*Finneseth*, 712 F.2d at 1044. In *Finneseth*, the body of water at issue, Dale Hollow Lake, although landlocked, straddled the Kentucky and Tennessee borders. Therefore, the issue of whether it was pos-

sible to travel by boat beyond the boundaries of the lake, as in the case at bar, was immaterial. It was unnecessary to make such a determination in order to find an interstate activity. The court merely concluded that commercial travel was susceptible on the lake between the two states. Common sense, at the least, led the court to conclude that commercial interstate traffic was possible between the shores of the lake.

### III.

■ Neither of the parties dispute that the aforementioned cases comprise the important principles from which this Court must draw upon in forming its decision. However, since none of these cases alone address the discrete issue presented here, the parties disagree upon how those cases apply to the facts of this case.

In *Finneseth*, the court found that Dale Hollow Lake was clearly susceptible to use for commercial traffic between two states. For instance, it would obviously be possible for a ferry to operate between two sides of the lake connecting the two states. This alone would be sufficient to convey a commercial content to the activity. *Id.* at 1047. By the same rationale, had the Missouri–Montana border run directly through the middle of the Missouri River, the court in *Adams* would have no doubt concluded that the waterway was susceptible to interstate commercial traffic, even if none existed at the time.

What distinguishes the case at bar from *Finneseth* is that the Dale Hollow Lake itself was clearly navigable in interstate commerce, whereas Lake Cumberland itself is not. The instant case is more analogous to *Adams* since "the reservoir created by lockless dams is solely within the confines of one state. Thus, the threshold requirement that the body of water be available as an interstate highway of com-

merce [is] not satisfied." *Finneseth* at 1044. The only additional fact that must be considered in the instant case is whether the extension of the Big South Fork River from Lake Cumberland in anyway operates to create "an interstate highway of commerce."

At this point the Court must step back from the confusing and sometimes contradictory statements of law in other cases and ask whether *this case* truly presents a circumstance in which admiralty jurisdiction is appropriate. The Court assumes that limited canoe and raft traffic exists along the Big South Fork River between Kentucky and Tennessee. However, the quality of this traffic itself is clearly not commercial in the traditional maritime sense.

In *Finneseth* the Court noted that under the "liberal definition given to 'customary modes of trade and travel on water' … there is no evidence before the Court which indicates that Dale Hollow Lake is not susceptible or capable of being used for transportation or commerce between Kentucky and Tennessee." *Finneseth* at 1044–45, quoting from *The Montello*, 87 U.S. (20 Wall.) 430, 440–43, 22 L.Ed. 391 (1874). In the instant case, although Lake Cumberland certainly can accommodate large pleasure craft, there is no evidence whatsoever that these can move in interstate commerce. That fact distinguishes Lake Cumberland from Dale Hollow Lake.

If Lake Cumberland stood alone as does Dale Hollow Lake, it most assuredly would not be governed by admiralty jurisdiction because interstate travel of any kind would be impossible.[2] Does the fact that a river, which trickles from a lake in one state and makes a meandering passage into another state, is at best navigable only by canoes and rafts show sufficient susceptibility to trade or travel to convey admiralty jurisdic-

---

**2.** At this point it should be noted that the instant case is not one in which navigability has been foreclosed by the creation of a modern dam, a set of locks or other manmade artificial means, such as was the case in *Adams* and *Livingston v. United States*, 627 F.2d 165 (8th Cir.1980). Here, the creation of Lake Cumberland made whatever limited navigation then existed (and

there is no evidence in the record that any existed whatsoever) more possible rather than blocking it. In *Adams* and in *Livingston,* it was argued that reconfiguration of the dams or locks or the return of the waterway to its original condition could create navigability, thus making the waterway "susceptible" to maritime travel. That is quite simply not the case here.

tion? Surely, this is not the "highway of commerce" Congress intended to regulate.

## IV.

Just as the facts of this case alone do not justify invoking admiralty jurisdiction, neither does any policy consideration argue for it. In *Finneseth*, the Sixth Circuit urges a finding of admiralty jurisdiction where a waterway is a "potential interstate highway of commerce." *Id.* at 1046. The facts of the instant case do not show commerce at all, unless one considers limited canoe and raft traffic to be commercial. Rather, this Court can find no "potential" for an interstate highway of commerce unless one speculates that a larger dam might be constructed in Tennessee or Kentucky or an act of God might occur which increases the water flow of the Big South Fork from Tennessee into Kentucky. But these circumstances fall out of the bounds of "potential" and into the realm of mere speculation.

The strong policy reasons set forth in *Finneseth* for converting admiralty jurisdiction do not change the result in the instant case. It must be acknowledged that not *every river, stream or tributary that meanders between states must reasonably be subject to uniform admiralty rules.* A line must be drawn and this Court believes that that line appropriately excludes those circumstances which comprise the instant case. Here, the Big South Fork River, which stretches from Tennessee to Kentucky and connects with Lake Cumberland, allows only canoe and raft traffic. This is not the sort of maritime activity in which uniform "rules of the road" are essential. This Court concludes that the barest trickle of interstate pleasure boat travel along the Big South Fork and the absolute absence of any traditional commercial travel leads to the unavoidable conclusion that admiralty jurisdiction in this case is unwarranted and does not further any significant federal policy promoted by the admiralty rules.

Therefore, this Court finds that because it is not a waterway susceptible or capable of being used as an interstate highway of commerce, either as it is presently used or as it may be susceptible to future use, Lake Cumberland is not a maritime locality within the admiralty jurisdiction of this Court under 28 U.S.C. § 1333(1) and 46 U.S.C.App. § 740. The Court is entering an appropriate Order conforming to this Memorandum Opinion.

## ORDER

This matter is before the Court upon Defendants' Motion to Set Aside the Court's Order dated October 10, 1992, pursuant to Rule 60 of the Federal Rules of Civil Procedure, due to the Court's adoption of the Magistrate's Findings of Fact, Conclusions of Law and Recommendations without considering Defendants' objections thereto. The Court has now considered those objections and has reviewed de novo the Magistrate's recommendation to exercise admiralty jurisdiction pursuant to 46 U.S.C.App. § 740.

Therefore, the Court being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendants' motion is SUSTAINED and the Court's Order dated October 10, 1992 is REMANDED;

IT IS FURTHER ORDERED that the Court REJECTS the Magistrate's recommendation to exercise admiralty jurisdiction and Plaintiff's First Cause of Action of the Amended Complaint is DISMISSED for lack of subject matter jurisdiction.