**Linda CHAPMAN, Plaintiff-Appellee and Cross-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee and Cross-Appellee.**

Nos. 75–2162, 75–2163.

United States Court of Appeals, Seventh Circuit.

Argued May 25, 1976.

Decided Aug. 20, 1976.

William Kanter, David V. Hutchinson, Attys., Dept. of Justice, Washington, D. C., Samuel K. Skinner, U. S. Atty., Chicago, Ill., for U. S.

Leonard R. Grazian, Chicago, Ill., for Chapman.

Before CLARK, Associate Justice *, CASTLE, Senior Circuit Judge, and CAMPBELL, Senior District Judge.**

CLARK, Associate Justice.

Linda Chapman, Administratrix of the Estate of Murrel Chapman, deceased, the appellee, recovered a judgment for $49,-207.00 against the United States of America, appellant, under the provisions of the Suits in Admiralty Act (46 U.S.C. § 741 et seq.), for the death of her husband, Murrel, when the small boat in which he was fishing was swept over a submerged dam in the Kankakee River. Initially, she included in her complaint an alternative count under the Federal Tort Claims Act (28 U.S.C. § 2671 et seq.), but the District Court dismissed the same, and no appeal was taken from that action. The United States contends that admiralty jurisdiction is not applicable because the Kankakee is not a navigable stream; and even if it is navigable that the United States did not own, construct, maintain or operate the dam and owed no duty, maritime or terrene, to mark it with a buoy or other type of marking.

* Associate Justice Tom C. Clark (Ret.), United States Supreme Court, is sitting by designation.

** Judge William J. Campbell, United States District Court for the Northern District of Illinois, is sitting by designation.

The District Court found to the contrary and our examination of the record indicates that substantial evidence supports that finding and that the judgment must therefore be sustained.

### 1. Nature of the Case:

Mr. Chapman and his sister-in-law Debbie Paty, were fishing from a sixteen foot aluminum outboard motorboat in the west fork of the Kankakee River when the boat went over an unmarked submerged dam that ran all the way across this fork of the river some 985 feet from its east shore to Island Park on the west. Debbie was rescued a half mile downstream, but Murrel's body was not found for a week. Neither had lifebelts or other safety devices. The gravamen of the complaint was that the unmarked dam—not visible downstream—was a "menace and hinderance to navigation" and the United States "negligently and wrongfully" caused, allowed and permitted the dam "to exist" and failed to warn boatmen of its "existence" and of "the swift and dangerous currents caused thereby." The case was tried to the court without a jury, and at the conclusion of the evidence the court found that the Kankakee River was "navigable at the point of the decedent's accident and is subject to the Admiralty Act", and it further found that "the decedent's activity was a maritime one and was covered by the Admiralty Act."

The court reasoned that the existence of the dam created a dangerous condition in navigable waters that was "almost invisible" to persons approaching it from upstream, that the United States had a duty to warn persons using the navigable waters of this hidden hazard to navigation, and, having failed to do so, was liable for its failure to warn. See 14 U.S.C. § 86 and *Buffalo Bayou Transportation Co. v. United States*, 375 F.2d 675 (5th Cir. 1967).[1] On the contributory negligence plea of the United States, the court found Chapman negligent by failing to keep a proper look-out; although warned in the past of the existence of the dam with its shore abutments clearly visible, he failed to take notice of it. On a subsequent hearing, the court found Chapman equally at fault, and on a comparative basis calculated the resulting damage to be $49,207.00, which amount was awarded to the appellee.

### 2. Our Conclusions:

We have gone through all of the evidence, exhibits, etc., and find ample evidence to support the District Court's findings. However, we emphasize our agreement with Judge Weigel, in *Adams v. Montana Power Company*, 9 Cir., 528 F.2d 437 (1975) that ordinarily in "the absence of commercial activity, present or potential, there is no ascertainable federal interest justifying the frustration of legitimate state interests." Here, however, as we shall point out *infra*, the United States' interest in the project for a century and the effort of the Corps of Engineers to abandon it unilaterally, without supervision or control, requires the exercise of jurisdiction and the placing of responsibility on the United States.

The record here shows that as early as 1822, Congress passed an Act granting to the State of Illinois the right of way for the building of an Illinois-Natchez Canal tying Chicago to the Kankakee River. The State, being without funds for construction of the canal, was the recipient of land granted by Congress in 1827. Sale of this land by the State raised the funds necessary for construction. The canal was completed by 1848. In connection with this project, the State built a dam across the Kankakee River near Wilmington, and constructed a water feeder from that point to the canal, but the State made no provision for boats navigating the Kankakee River to pass the State's dam. A private company subsequently raised the dam two feet and constructed additional locks and dams in the Kankakee above that point. These im-

---

1. Count II of the complaint was stricken by the Court on the ground that under the Tort Claims Act § 2680(a), negligence, which it found present, was a complete defense to appellee's claim.

provements provided an outlet for Kankakee Valley freight to go by water to Chicago and St. Louis. Boats were scheduled regularly from Custer Park to Chicago and St. Louis, generally weekly, carrying grain and other products and brought back lumber, iron, coffee, sugar, salt and many other articles. As late as 1879, the Kankakee River was found navigable, even during the low water season, for small light-draft vessels. By 1931 the steamers that had used the Kankakee for years had abandoned their schedules, but even as of that date, a small side-wheel steamer was still operating.

The record also shows that as late as 1931, the Congress had authorized the construction of several bridges across the Kankakee; a number of other permits authorizing overhead wires, submarine cable, etc., were issued by the Corps of Engineers. Furthermore, a Declaration of Intention filed by the Public Service Company of Northern Illinois to construct a dam at Aroma Park and other works on the Kankakee was docketed with the Federal Power Commission on February 15, 1924. The District Engineer of the Corps of Engineers recommended that the Kankakee be considered a navigable stream, subject to the jurisdiction of the Federal Power Commission. The War Department concurred in this recommendation, but the application was denied. On March 22, 1924, Senate Bill 2904 was introduced declaring the Kankakee to be non-navigable for some 27 miles beginning at a point 5 miles from its mouth and the Aroma Park site where the dam was proposed. The Secretary of War vigorously opposed the legislation, advising the Congress, in part:

It thus appears that the river has been extensively improved by State and private agencies in the interest of navigation and for other purposes. The enactment of the proposed Bill would remove this section of the river from the usual federal supervision. Experience has shown that supervision of streams of minor importance even is likely to benefit both public and private interests by insuring the planning and execution of operations affecting them that the public interest will be conserved.

So far as is known the enactment of this Bill would benefit no public interest and is not necessary for any purpose. In view of the public use that has been made of the river in the past and which the State of Illinois is improving at large expense, it is my opinion that the passage of the Bill is not desirable and I recommend that it not be considered favorably.

The Bill was never enacted, and the Commission denied the application.

It appears that the District Engineer, Corps of Engineers, U.S. Army, having jurisdiction of the Kankakee River area, was influenced in his decision that the Kankakee was navigable by the decision of the Supreme Court in *Economy Light and Power Company v. United States*, 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 487 (1921), which involved the navigability of the Des Plaines River from Riverside, Illinois, to its mouth, which included rapids where the fall was 78 feet in ten miles. Above Lockport the low water flow was so small and the boulders in the stream so numerous that a person could cross the river by stepping from stone to stone and not get his feet wet. The Court held that a river was navigable in law even though it contains natural obstructions and though it be not open to navigation at all seasons or at all stages of water (p. 121, 41 S.Ct. 409). The federal authority over navigable streams in Illinois and neighboring states sprang, the Court held, from the compact in the Ordinance of July 13, 1787, Article 4, for the government of the territory northwest of the Ohio River, declaring all navigable waters leading into the Mississippi River to be "common highways." (The Des Plaines and Kankakee join just below Joliet, Illinois, to form the Illinois River which flows into the Mississippi). It appears that the Kankakee River watershed is over four times as large as that of the Des Plaines; its minimum discharge ranges from 300 to 900 cubic feet per second and its mean annual flow is 4100 cubic feet per second; and it is some four times as large as the Des Plaines, with approximately four times its navigable capacity.

It is true that the finding of navigability of the Kankakee by the District Engineer in 1931 was contrary to that of the Division Engineer, dated March 8, 1932, made pursuant to a circular letter of the Chief of Engineers dated January 8, 1931, subject—Navigable Status of Waterways—United States. We note, however, that the Division Engineer found "no historical evidence to prove that the Kankakee River, in its natural state, ever constituted a route or highway for interstate commerce." On the contrary, both the District Engineer and the District Court found much evidence on this point. Moreover, the Division Engineer found the Des Plaines case "not applicable in determining the navigable status of the Kankakee River." Both the District Engineer and the District Court found the case controlling and we agree.

3. The Law of the Case:

▮▮▮▮ As both the Supreme Court and the various Courts of Appeals have held again and again, the jurisdiction of the United States under the Admiralty Act is determined by whether a waterway is capable of being used for the purposes of commerce. *The Montello*, 20 Wall. 430, 87 U.S. 430, 441, 22 L.Ed. 391 (1874); *Economy Light and Power Co. v. United States, supra.* The evidence here shows that the Kankakee was used by fur traders, very much the same as the Des Plaines, long before the building of the dam by Illinois with the approval and assistance of the Congress. This dam was built in order to divert some of the water of one fork of the river into the canal and permit additional traffic on the Kankakee from Chicago, and vise versa, while handling freight from the Kankakee territory to the Chicago and St. Louis markets. Freight as well as steamers passed over the Kankakee well into the present century. As late as 1924, the Congress, the Secretary of War, the State of Illinois and the Federal Power Commission recognized the Kankakee as a navigable stream. Indeed, the Secretary seems to have been the direct cause of the failure of the proposed legislation declaring the Kankakee non-navigable; and we note that his underlying ground was that the Kankakee should remain under the "usual federal supervision". With this wealth of evidence to the contrary, we cannot say that the District Court erred in not following the finding of the Division Engineer. After all, the latter's views, even though approved by the Chief Engineer, only represent the views of the Army Engineers, not those of the United States. Only Congress or the judiciary can determine such a question conclusively. The District Court heard the evidence and decided the issue, and in the light of the facts, we cannot say that it erred in deciding against the Engineers. Nor can we hold, as we have already said, that the Government's involvement in the project was so slight as to justify a refusal to exercise admiralty jurisdiction.

▮▮▮▮ The United States emphasizes that it did not own, construct, maintain or in any way operate the dam involved here; nor did it ever undertake "a duty to mark the dam." [2] It begs the question posed here, i. e., did it owe the duty to mark the dam? The evidence clearly demonstrates that the United States actively participated in the erection of the dam: The Congress in 1927 granted the right of way for the canal that led to the building of the dam; it made direct grants of land for the sole purpose of furnishing the means for Illinois to build the canal and the dam; both were built with the knowledge, consent, and assistance of the United States; Congress not only recognized but claimed a dominant servitude over the Kankakee by taking such

---

**2.** It cites *Indian Towing Company v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) and *Blanksten v. United States*, 236 F.Supp. 280 (N.D.Ill.1964), as supporting its position. However, *Indian Towing* stands for the proposition that where the Government has gone into the business of erecting lighthouses, it must, after erecting one, properly maintain it.

We might cite it as a first cousin to this case. In *Blanksten*, a small boat ran into a seawall which was built on land abutting navigable waters. The United States never asserted any jurisdiction over the seawall, had nothing to do with its erection, and it was not located in navigable waters as was the dam here.

actions; and, in addition, the United States further recognized its dominant power over the Kankakee by granting bridge privileges at other points along the river, as well as overhead wires, submarine cables, etc.; and as late as 1924 the Federal Power Commission recognized its jurisdiction over the Kankakee as a navigable stream, as did the Army Engineers in acquiescing thereto, and the Secretary of War claimed specific supervision over it; finally, Congress acquiesced by failing to enact proposed legislation declaring the Kankakee non-navigable. We believe that in such a state of the record that jurisdiction would lie under the Suits in Admiralty Act, *Buffalo Bayou Transportation Company v. United States*, 375 F.2d 675 (5th Cir. 1967) and that the failure of the United States to warn those using the Kankakee that this dangerous hazard existed, stated a cause of action thereunder.

As we have already indicated, we heartily agree that the "application of a uniform body of federal law, on waters devoid of trade and commerce, to regulate the activities and resolve the disputes of pleasure boaters" *Adams v. Montana Power Co., supra,* at 440, not only does not make sense, but "frustrat[es] the purposes of state tort law . . ." *Id.,* at 441. However, here the United States was a procuring cause of the dam being constructed and has let it become submerged under the surface water, becoming a hazard to the safety of all who approach it. As late as 1932, the United States has evidenced a continuing right of supervision over the Kankakee, at which point in time it claimed by means of an inter-office memorandum that it could escape all further responsibility. Now the Kankakee at the point of the dam has become a resort for fishermen, picnickers, sailors, bathers, waterskiers, and sightseers, which from a safety standpoint requires even greater supervision. The United States has, *ex parte,* renounced the supervision it had claimed for a century and has not only permitted the dam to deteriorate into a number one water hazard but has not even placed warning signs to alert the public to the dangers that it has helped to create. This seems to us both untenable and unseemly. As we have been granted admiralty jurisdiction over maritime activity, it is imperative that that jurisdiction be exercised here.

Appellee, as cross appellant, urges that the $2000 income tax computed and deducted on annual earnings should be forgiven under *Cox v. Northwest Airlines, Inc.,* 379 F.2d 893 (7th Cir. 1967) because of the size of the income, the fact that it is based on 1968 dollars whose subsequent erosion has stripped them of much power in the market place, as well as the failure to award attorney fees. There is much equity in this claim, and we therefore strike out the deduction of income tax and increase the net annual earnings to $10,467.00, which in accumulation will make the total recovery $56,875.00 and judgment is awarded in this amount; otherwise, the decision of the District Court is

AFFIRMED.