## Linda CHAPMAN, Plaintiff-Appellee and Cross-Appellant,

v.

## UNITED STATES of America, Defendant-Appellant and Cross-Appellee.

### Nos. 75–2162 and 75–2163.

United States Court of Appeals, Seventh Circuit.

Reheard In Banc Oct. 19, 1977.

Decided May 1, 1978.

As Amended June 9, 1976.

David V. Hutchinson, Admiralty & Shipping Section, U. S. Dept. of Justice, Washington, D. C., for defendant-appellant and cross-appellee.

Leonard R. Grazian, Chicago, Ill., for plaintiff-appellee and cross-appellant.

Before FAIRCHILD, Chief Judge, CASTLE, Senior Circuit Judge, SWYGERT, CUMMINGS, PELL, SPRECHER, TONE, BAUER and WOOD, Circuit Judges.

TONE, Circuit Judge.

The issue on which this case turns, in the view of a majority of the court, is whether the federal admiralty jurisdiction extends to tort claims involving the operation of small pleasure boats over waters that, although navigable and used for commercial transportation in the past, are now used and likely to be used only for recreational activities. We hold that admiralty jurisdiction does not exist under these circumstances.

Murrell Chapman drowned in the Kankakee River when the small boat in which he was fishing swept over an unmarked submerged dam and capsized. His administrator sued the United States under the

Suits in Admiralty Act, 46 U.S.C. § 741, *et seq.*, contending that it had a duty to mark the dam, and recovered a judgment for $49,207 in a bench trial.

A panel of this court affirmed the judgment, with minor modifications, 541 F.2d 641 (1976), and confirmed that action in a later, revised version of the same opinion, which has not been published. We granted rehearing in banc and now reverse the judgment.

The dam in question lies between the left bank and an island at Wilmington, Illinois, where the river flows north. The United States did not build the dam and has never owned it, maintained it, marked it, or had any other connection with it.[1] The City of Wilmington now owns the dam. The island on which the east end of the dam abuts is a public recreational park. Prior to the accident the dam was marked by barrels placed by the Wilmington Rotary Club, but these markings were not there when the accident occurred. Since the accident, the dam has been marked by buoys placed by the Illinois Department of Conservancy.

The Kankakee River, which joins with the Des Plaines to form the Illinois River a few miles downstream from Wilmington, was not a part of the waterway connecting Lake Michigan and the Mississippi River via the Illinois-Michigan Canal.[2] Running from the Chicago River to the Illinois River at LaSalle, Illinois, the 96-mile canal was built under the authority of the State of Illinois. The right of way for the canal and additional land to be sold to raise money for construction were granted by Congress to the state in the 1820's, but construction was not commenced until 1836; the canal was completed in 1848.[3] It served as an artery of commerce for several decades but became obsolete long before the turn of the century and, according to the Encyclopaedia Britannica, has not been used since 1900.[4] The present Illinois Waterway parallels the old canal.[5]

The only relationship the Kankakee River had with the Illinois-Michigan Canal was as a source of additional water. To collect the water and divert it to the canal, the state built a dam across the Kankakee a short distance below Wilmington and a feeder canal from that point to the Illinois-Michigan Canal.

There was once some commercial navigation on the Kankakee itself. In 1847 a private company was organized for the purpose of improving navigation and developing water power on that river. Pursuant to authority obtained from the state, the company proceeded to raise the state dam, built a lock in the feeder canal, and built four additional dams and locks, providing navigation for some distance above Wilmington. One of these four dams was the one involved in this case.

---

1. A statement in the initial panel opinion that the United States had participated in the erection of the dam, 541 F.2d at 645, was deleted from the unpublished, revised panel opinion. A statement that "the United States was a procuring cause of the dam being constructed," 541 F.2d at 646, was changed to "the United States was of major significance in the dam's construction." Our examination of the record convinces us that the facts are as we have stated in the text. Appellee does not argue to the contrary.

2. Nor was it a part of the early Chicago-Des Plaines-Illinois trading route described in *Economy Light & Power Co. v. United States*, 256 U.S. 113, 41 S.Ct. 409, 65 L.Ed. 847 (1921).

3. "Illinois and Michigan Canal" 5 *Encyclopaedia Britannica* 303 (1975); 1 E. Dunne, *Illinois, The Heart of the Nation* 365–370 (1933).

4. See note 3, *supra.*

5. See *Encyclopaedia Britannica, supra*, note 3. The Illinois Waterway Strip Maps published by the U.S. Army Engineer District, Chicago, show the Illinois-Michigan Canal running roughly parallel with the Des Plaines and Illinois Rivers from the Des Plaines River at Brandon Road Lock and Dam in Joliet to LaSalle, but do not show the old canal north of that lock and dam. The Chicago Tribune Chicagoland Map, however, shows the old canal leaving the Des Plaines just south of the Old State Prison in Joliet and running parallel with the Chicago Sanitary and Ship Canal as far north as Archer Avenue in Chicago.

The Kankakee received some attention from Congress and some federal supervision. In 1878 and 1879 Congress appropriated money for study and improvements of the Kankakee.[6] In 1915 money was appropriated for flood protection along the river, with the federal government's participation to be based on "the value of protection to navigation."[7] At various times before 1931 Congress authorized construction across the Kankakee of bridges[8] and another dam,[9] and the Army Corps of Engineers issued permits authorizing installation of overhead wires and submarine cables across the river. In 1924 a power company filed with the Federal Power Commission a declaration of intent to build a dam and other works in the river, and the District Corps of Engineers recommended that the river be considered a navigable stream subject to the FPC's jurisdiction. During the same year the Secretary of War opposed a bill in Congress that would have declared the river to be nonnavigable for some 27 miles, which would include the Wilmington section. Congress did not adopt the bill. In 1932, however, the Corps of Engineers, acting through its Division Engineer, determined that this part of the Kankakee was not navigable, although the Division Engineer's subordinate, the District Engineer, had made a contrary recommendation.

After 1931 at the latest, no commercial vessels of any kind used the Kankakee River, and the federal government exercised no supervisory authority over it. Since that time the river has been used solely for recreational purposes. It is not now usable for commercial shipping.

## I.

In *Adams v. Montana Power Co.*, 528 F.2d 437 (1975), the Ninth Circuit held that the admiralty jurisdiction did not extend to a tort claim arising in waters "traversed by small pleasure craft only," where "no commercial shipping occurred or was likely to occur," *id.* at 440, notwithstanding that the waters were navigable for purposes of Congress' exercise of its powers under the commerce clause, *id.* We agree with that opinion and adopt its reasoning, including the following passages:

The logic of requiring commercial activity is evident. The purpose behind the grant of admiralty jurisdiction was the protection and the promotion of the maritime shipping industry through the development and application, by neutral federal courts, of a uniform and specialized body of federal law. . . . The strong federal interest in fostering commercial maritime activity outweighed the interest of any state in providing a forum and applying its own law to regulate conduct within its borders. It follows that admiralty jurisdiction need and should extend only to those waters traversed or susceptible of being traversed by commercial craft. In the absence of commercial activity, present or potential, there is no ascertainable federal interest justifying the frustration of legitimate state interests.

\*　　\*　　\*　　\*　　\*　　\*

The damming of a previously navigable waterway by a state cannot divest Congress of its control over a potentially useful artery of commerce, since such obstructions may always be removed. Hence the courts have reasonably held that a navigable river is not rendered non-navigable by artificial obstruction.

However, if the damming of a waterway has the practical effect of eliminating commercial maritime activity, no federal interest is served by the exercise of admiralty jurisdiction over the events transpiring on that body of water, whether or not it was originally navigable. No

---

**6.** Act of June 18, 1878, ch. 264, 20 Stat. 162. A further appropriation was made for an examination and survey. Act of March 3, 1879, ch. 181, § 2, 20 Stat. 374.

**7.** Act of March 4, 1915, ch. 142, § 15, 38 Stat. 1060.

**8.** Act of Jan. 24, 1923, ch. 35, 42 Stat. 1171–2; Act of March 21, 1924, ch. 72, 43 Stat. 29; Act of Jan. 31, 1931, ch. 89, 46 Stat. 1058; Act of Feb. 29, 1932, ch. 60, 47 Stat. 58. The last three bridges were to be "suitable to the interests of navigation."

**9.** Act of Feb. 28, 1929, ch. 362, 45 Stat. 1345–6.

purpose is served by application of a uniform body of federal law, on waters devoid of trade and commerce, to regulate the activities and resolve the disputes of pleasure boaters. . . . [T]he burdening of federal courts and the frustrating of the purposes of state tort law would be thereby served.

*Id.* at 439, 440–441 (citations and footnotes omitted).

The *Adams* decision is consistent with *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972). In each of these cases the holding that admiralty jurisdiction did not exist, in *Adams* over waters unusable for commercial maritime activity and in *Executive Jet* over an aircraft accident unrelated to such activity although occurring in navigable waters, was based on the same principle, *viz.,* that the reason for the existence of admiralty jurisdiction is to protect and promote commercial maritime activity through the development of a uniform federal maritime law. The Court in *Executive Jet* expressly confined its holding to aviation torts, 409 U.S. at 268, 274, 93 S.Ct. 493, but its reasoning is nevertheless instructive. In reaching the conclusion that the alleged wrong did not "bear a significant relationship to traditional maritime activity," *id.* at 268, 93 S.Ct. at 504, *i. e.,* activity "involving navigation and commerce on navigable waters," *id.* at 272, 93 S.Ct. at 506, the

Court pointed to the inappropriateness of applying to aircraft crash cases the rules developed in admiralty for traditional maritime disputes, *id.* at 269–271, 93 S.Ct. 493, and observed that the state courts "could plainly exercise jurisdiction over the suit, and could plainly apply familiar concepts of [state] tort law without any effect on maritime endeavors." *Id.* at 273, 93 S.Ct. at 507 (footnotes omitted). The same can be said of a claim arising out of a pleasure boat accident in waters used exclusively for recreational activities.[10]

## II.

The United States, as we have noted, has never had any connection with the dam in question. Even if it had, however, that would not give rise to admiralty jurisdiction, although jurisdiction and liability under the Federal Tort Claims Act might well exist. That Act is not invoked here.[11]

The panel of this court that originally heard this appeal rested its holdings as to both admiralty jurisdiction and liability upon federal land grants for the creation of the waterway in the 1820's and federal supervision over the waterway through the 1920's. Thus the panel, while expressing agreement in principle with *Adams,* said that "the United States' interest in the project for a century and the effort of the Corps of Engineers to abandon it unilaterally, without supervision or control, requires

**10.** The reach of admiralty jurisdiction over pleasure boat mishaps occurring in navigable waters used for commercial activity is, of course, not before us. The Supreme Court assumed without discussion in cases decided before *Executive Jet* that the operation of pleasure boats on such waters was within the admiralty jurisdiction. *Levinson v. Deupree,* 345 U.S. 648, 73 S.Ct. 914, 97 L.Ed. 1319 (1953) (crash of two motorboats); *Coryell v. Phipps,* 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943) (fire on yacht damaging other craft in yacht storage basin); *Just v. Chambers,* 312 U.S. 383, 61 S.Ct. 687, 85 L.Ed. 903 (1941) (injury to passengers on yacht caused by carbon monoxide); see *Crosson v. Vance,* 484 F.2d 840, 842 (4th Cir. 1973); *Richards v. Blake Builders Supply Inc.,* 528 F.2d 745, 749 (4th Cir. 1975). In a variety of fact situations, other circuits have reached the same result after *Executive Jet.* See *Kelly v. United States,* 531 F.2d 1144, 1146–1147 (2d Cir. 1976) (action against Coast Guard for negligence in failing to rescue erst-

while passengers of capsized sailboat); *Richards v. Blake Builders Supply Inc., supra,* 528 F.2d at 745 (crash of motorboat against bank of stream); *Kelly v. Smith,* 485 F.2d 520, 523–526 (5th Cir. 1973); *cert. denied,* 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974) (poachers in motorboat injured by rifle fire aimed at them by members of private hunting preserve on shore); see also *St. Hilaire Moye v. Henderson,* 496 F.2d 973, 976–979 (8th Cir.), *cert. denied,* 419 U.S. 884, 95 S.Ct. 151, 42 L.Ed.2d 125 (1974) (injury to motorboat passenger resulting from improper operation of boat). But compare Stoltz, *Pleasure Boating and Admiralty: Erie at Sea,* 51 Cal.L.Rev. 661 (1963).

**11.** The District Court's finding of no liability because of plaintiff's contributory negligence on a count brought under that Act is not challenged on appeal. See 541 F.2d at 642 and 643 n.1.

the exercise of jurisdiction and the placing of responsibility on the United States." 541 F.2d at 643. In its revised opinion the panel retained the quoted language and also said, "[T]he evidence of the United States involvement in the Illinois-Michigan Canal project as well as supervisory functions cannot be denied." [12] The United States' involvement in the Illinois-Michigan Canal consisted of land grants by Congress to the State of Illinois over a century and a half ago for the construction of a canal that not only has been unused by commercial traffic for generations but was part of a waterway that did not include the Kankakee River. The only relationship the Kankakee had to that waterway was as a source of water. The federal supervisory functions did relate to the Kankakee River itself, but they consisted only of Congress' authorization of the construction of bridges and another dam and the Corps of Engineers' authorization of power lines and submarine cables in or over the river, all prior to 1931.

In our opinion, these facts do not require or justify the exercise of admiralty jurisdiction. We can conceive of no reason for holding the *Adams* rule inapplicable if the waters have ever been used for commercial maritime activity and were accordingly once federally regulated. The Suits in Admiralty Act, under which this action was brought, does not support such a result; that Act merely waives the sovereign immunity of the federal government, *i. e.*, it subjects the United States to a suit in admiralty in circumstances in which such a suit could be maintained in admiralty against a private person. 46 U.S.C. § 742. See *State of Maine v. United States*, 134 F.2d 574 (1st Cir.) *cert. denied*, 319 U.S. 772, 63 S.Ct. 1437, 87 L.Ed. 1720 (1943); *cf. Romero v. International Terminal Operating Co.*, 358 U.S. 354, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959); *Hart and Wechsler's The Federal Courts and The Federal System* 1329 (Bator, *et al.* ed. 1973). The Fifth Circuit's *Buffalo Bay-*

*ou Transportation Co. v. United States*, 375 F.2d 675 (1967), relied upon by appellee and cited by the panel, countenanced an action under that Act when another federal statute, the Wreck Act, 33 U.S.C. §§ 409, 414, 415, imposed a maritime related duty on the United States or its agent (although holding that there was no liability on the facts shown); but it involved a commercial vessel on waters used for commercial navigation. *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955), referred to by the panel in connection with the liability issue "as a first cousin to this case," did not involve the admiralty jurisdiction of the federal courts.

We hold that a recreational boating accident does not give rise to a claim within the admiralty jurisdiction when it occurs on waters that, although navigable for purposes of Congress' power under the commerce clause, *Economy Light & Power Co. v. United States, supra*, 256 U.S. at 118, 41 S.Ct. 409, *et seq.*, are not in fact used for commercial navigation and are not susceptible of such use in their present state.

·We express no opinion on the issue of whether the United States has a duty to remove obstructions in waters used for traditional maritime purposes, decided favorably to the government by Judge Will in *Blanksten v. United States*, 236 F.Supp. 280 (N.D.Ill.1964) [13] (following *Thornton v. United States*, 236 F.Supp. 651 (S.D.Miss. 1964)), and addressed in the *Buffalo Bayou* case, *supra*, and *Lane v. United States*, 529 F.2d 175 (4th Cir. 1975). We note that the panel decision no longer stands as a precedent on the duty issue, because the effect of granting the rehearing in banc was to vacate the panel opinions.

The judgment is reversed, and the case is remanded to the District Court with directions to dismiss the admiralty claim for want of jurisdiction. The judgment in favor of the United States on a second count, based on the Federal Tort Claims Act, 28

---

12. This language replaced the statement in the earlier panel opinion, referred to in note 1, *supra*, that the United States had participated in the erection of the dam in question.

13. It appears from the opinion in *Blanksten* that the seawall was constructed upon "the bed of Lake Michigan" and was "erected in a navigable waterway." 236 F.Supp. at 281. Compare 541 F.2d at 645 n.2.

U.S.C. § 2671, *et seq.* has not been appealed and will stand.

CASTLE, Senior Circuit Judge, dissenting.

The majority states that they "can conceive of no reason for holding the *Adams* rule inapplicable if the waters have ever been used for commercial maritime activity and were accordingly once federally regulated." (page 151.) This broad rule permits the government to withdraw unilaterally and with impunity its supervision over dangerous objects which were placed in a waterway while those waters were "commercial" and under federal control. In this suit against the United States, the panel properly distinguished the *Adams* case and denied the federal government the jurisdictional shield it has now obtained. 541 F.2d at 646. Regarding the liability issue, I remain convinced that the United States owed a duty to persons using the Kankakee River to mark the dam for the reasons stated in the revised opinion of the original panel. I respectfully dissent.