# United States Court of Appeals
## For the First Circuit

---

No. 03-1980

DAMON R. CUNNINGHAM, JR.,

Petitioner,

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS,
UNITED STATES DEPARTMENT OF LABOR; BATH IRON WORKS,

Respondents.

---

ON PETITION FOR REVIEW OF A DECISION OF THE BENEFITS REVIEW BOARD

---

Before

Torruella, Circuit Judge,
Coffin, Senior Circuit Judge,
and Lynch, Circuit Judge.

---

Marcia J. Cleveland for petitioner.
Barry H. Joyner, Attorney for the Director, with whom Howard
M. Radzely, Solicitor of Labor, Donald S. Shire, Associate
Solicitor, and Mark A. Reinhalter, Counsel for Longshore, were on
brief for the Director, Office of Workers' Compensation Programs.
Stephen Hessert with whom Doris V. R. Champagne and Norman,
Hanson & Detroy, LLC, were on brief for Bath Iron Works.

---

August 3, 2004

---

**COFFIN**, <u>**Senior Circuit Judge**</u>. Petitioner Damon E. Cunningham, Jr. has been a pipe fitter for Bath Iron Works in Bath, Maine, for more than 25 years, and since 1998 has worked at the company's East Brunswick Manufacturing Facility ("EBMF"). At the EBMF, which is approximately 3.5 to 4 miles from BIW's main shipyard in Bath, workers prefabricate pipe units that are transported by truck and installed in ships at Bath. Cunningham injured his back at EBMF in October 1999 and subsequently sought disability coverage under the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §§ 901-950. An Administrative Law Judge ("ALJ") and the Benefits Review Board ("BRB" or "Board") denied his claim on the ground that the EBMF is not a covered work location.

In his petition for review, Cunningham asserts that the ALJ and Board erred by too narrowly defining the reach of the statute. He contends that the EBMF qualifies as an area that adjoins navigable waters. <u>See</u> 33 U.S.C. § 903(a). Although Cunningham presents a sympathetic case based on the nature of his employment, we conclude that the ALJ properly determined that the LHWCA does not presently confer benefits on employees who are injured at the EBMF. We therefore must deny the petition for review.

## I. <u>Background</u>

The LHWCA was enacted in 1927 to provide compensation for maritime workers who were injured while working on navigable waters

in the course of their employment.  Director, Office of Workers'
Comp. Programs v. Perini North River Assocs., 459 U.S. 297, 311
(1983); Northeast Marine Terminal Co. v. Caputo, 432 U.S. 249, 257-
58 (1977).  Initially, a maritime worker was covered under the
statute only if his injury occurred while he was performing work on
the seaward side of the shore.  Caputo, 432 U.S. at 258.[1]  In 1972,
the law was significantly amended, see id. at 261; Perini North
River Assocs., 459 U.S. at 313, and one of the changes made is at
the heart of this case.  Rather than stopping at the water's edge,
coverage under the act was extended shoreward in recognition that
"modern technology had moved much of the longshoreman's work onto
the land," Caputo, 432 U.S. at 262 & n.20; see S. Rep. No. 92-1125,
at 12-13 (1972); H.R. Rep. No. 92-1441, at 10-11 (1972), reprinted
in 1972 U.S.C.C.A.N. 4698, 4707-08.  The pertinent section of the
amended statute provides as follows:

> [C]ompensation shall be payable under this chapter
> in respect of disability or death of an employee,
> but only if the disability or death results from an
> injury occurring upon the navigable waters of the
> United States (including any adjoining pier, wharf,
> dry dock, terminal, building way, marine railway,
> or other adjoining area customarily used by an
> employer in loading, unloading, repairing,
> dismantling, or building a vessel).

---

[1] In Southern Pacific Co. v. Jensen, 244 U.S. 205 (1917), the
Supreme Court established what has since been called the "Jensen
line," the line between the water and land.  The Court held that
maritime employees injured on the seaward side of the line were not
covered by state workers' compensation laws.  The LHWCA was enacted
in 1927 to cover those workers.

33 U.S.C. § 903(a).

Among the other changes effected by the 1972 Amendments was the addition of a requirement that the injured employee be engaged in maritime employment. See Caputo, 432 U.S. at 263-64 & n.21; 33 U.S.C. § 902(3). Previously, a worker generally was entitled to compensation so long as his injury occurred on navigable waters, without regard to whether his particular job was maritime in nature. Caputo, 432 U.S. at 263-64. Eligibility for coverage under the LHWCA is thus now subject to both a "status" test and a "situs" test. Cunningham's status as a maritime worker is uncontested, and we therefore must address only whether the "situs" of his employment – the EBMF – falls within the statutory definition. Because Cunningham's injury occurred neither on a navigable waterway nor on any of the specific sites listed in section 903(a), the issue is whether the EBMF constitutes an "other adjoining area" under the statute.

As noted earlier, the EBMF is several miles from BIW's main shipyard, which is located on the Kennebec River in Bath. The pipe and tin shops housed at the EBMF originally were located at the main shipyard and were moved in 1990 because more space was needed for them to operate efficiently. The work done at the EBMF is fully integrated into BIW's shipbuilding process; since 1995, the company has utilized a "just-in-time" system in which components

are prefabricated in East Brunswick and delivered to Bath just before they are needed for installation in the ships.

The EBMF is one of five BIW facilities concentrated in the same area of East Brunswick. The complex of BIW buildings dominates the eastern portion of Brunswick, accounting for more acres and more employees than other land users. Other maritime businesses are located in East Brunswick, including a marina and propeller shop, but the area between the Bath shipyard and BIW's East Brunswick complex is not predominantly maritime in character. Based on a review of maps, photographs and testimony, the Board reported that the area contains restaurants, motels, convenience stores, gas stations, residences and other non-maritime uses.

Although removed by several miles from the Kennebec River, the EBMF does have proximity to salt water, at least some of which indisputably is navigable. At its closest point, the EBMF property is about 1,400 feet from the navigable New Meadows River, an inlet of Casco Bay. The property also is crossed by a body of water identified as Thompson Brook by BIW and described as a tidal saltwater marsh by petitioner. The parties debate whether that waterway is navigable within the meaning of the LHWCA.

After examining a variety of factors – including the geography, tidal activity and history of the area, as well as the relationship between BIW's main shipyard and the East Brunswick site – the ALJ concluded that the EBMF is neither literally

-5-

contiguous to navigable waters nor otherwise an "adjoining area" within the meaning of section 903(a). The ALJ rejected petitioner's contention that Thompson Brook is navigable, finding, among other factors, that the waterway does not meet the requirement that it either be currently used for commercial purposes or reasonably capable of future commercial use. In evaluating whether the EBMF is an "adjoining area" in relation to the New Meadows River, the ALJ utilized a test set out by the Ninth Circuit in Brady-Hamilton Stevedore Co. v. Herron, 568 F.2d 137, 141 (9th Cir. 1978), that focuses on the "functional relationship" between the workplace and navigable waters. See also Texports Stevedore Co. v. Winchester, 632 F.2d 504, 513-14 (5th Cir. 1980) (en banc); but see Sidwell v. Express Container Servs., Inc., 71 F.3d 1134, 1138-39 (4th Cir. 1995).[2] The ALJ found that no functional connection existed between the maritime work done at the facility and the New Meadows River, and thus that the EBMF was not covered as an extension of that waterway. The ALJ did not address the question whether the EBMF was an area adjoining the BIW shipyard on the Kennebec.

The Board largely agreed with the ALJ's findings, which it deemed supported by substantial evidence and consistent with the

---

[2] Sidwell takes a much more literal view of the "other adjoining area" language, holding that "an area is 'adjoining' navigable waters only if it 'adjoins' navigable waters . . . ," 71 F.3d at 1138. We further address the different tests in our discussion in Section II infra.

relevant case law. Although the ALJ did not explicitly consider the nexus between the EBMF and the Kennebec River, the Board's examination of the undisputed facts and the judge's subsidiary findings led it to conclude as a matter of law that the EBMF "is not within the perimeter of a general maritime area around the Kennebec River or the main shipyard."

Petitioner Cunningham asserts that the ALJ and Board decisions were infected by numerous factual and legal errors, including misinterpretation of the Herron "functional relationship" test, neglect of a statutory presumption in favor of coverage, and lack of record support for the finding that the salt marsh – the body of water called Thompson Brook by the ALJ and the Board[3] – was not, and could not be made, navigable.

We review the Board's rulings of law de novo and otherwise examine its decision to determine if it adhered to the "substantial evidence" standard in reviewing the ALJ's factual findings. Bath Iron Works v. Director, Office of Workers' Comp. Programs, 244 F.3d 222, 226 (1st Cir. 2001); Prolerized New England Co. v. Benefits Review Bd., 637 F.2d 30, 35-36 (1st Cir. 1980).

## II. Discussion

We dispose preliminarily of petitioner's contention that we must view this case with a bias in favor of coverage, pursuant to

---

[3] For convenience, we shall refer to the waterway as Thompson Brook.

33 U.S.C. § 920(a). Section 920(a) states a presumption that "the claim comes within the provisions of this chapter" if there is no "substantial evidence to the contrary." In Stockman v. John T. Clark & Son of Boston, Inc., 539 F.2d 264, 269 (1st Cir. 1976), we held that this provision does not govern general interpretation of the situs requirement. Like Stockman, this case requires us to address "'general propositions or methods of approach,'" id. at 270 (citation omitted), for determining when a workplace may be classified as an "adjoining" area. How these standards, in turn, apply to the largely undisputed facts also requires legal judgments about the statute's scope that we conclude are not subject to the presumption. Cf. Pittston Stevedoring Corp. v. Dellaventura, 544 F.2d 35, 48 (2d Cir. 1976), aff'd sub nom. Northeast Marine Terminal Co. v. Caputo, 432 U.S. 249 (1977) ("[T]he very fact that the presumption can be overcome by substantial contrary evidence indicates its inapplicability to an interpretive question of general import . . . .").

We thus turn to the substantive question before us: whether the EBMF is an "adjoining area" under section 903(a), entitling employees working there to the LHWCA's disability coverage. We are mindful that Congress intended through this provision to extend the statute's reach to employees performing maritime work away from the water's edge and that the broad language of the 1972 Amendments "suggests that we should take an expansive view of the extended

-8-

coverage," Caputo, 432 U.S. at 268; see also Perini North River Assocs., 459 U.S. at 315-16.

This court has not yet articulated a standard methodology for approaching the question of "adjoining area."[4]  As noted earlier, however, other circuits have adopted varied approaches in evaluating whether a given workplace qualifies as an "adjoining area" under the statute.  Both the Ninth Circuit in Herron, 568 F.2d at 137, and the Fifth Circuit in Winchester, 632 F.2d at 504, view that phrase to describe "a functional relationship that does not in all cases depend upon physical contiguity," Herron, 568 F.2d at 141.  A court assessing the relationship must instead balance all relevant circumstances.  The Ninth Circuit listed several factors that, among others, it believed should be considered in determining whether a site is "adjoining":

> the particular suitability of the site for the maritime uses referred to in the statute; whether adjoining properties are devoted primarily to uses in maritime commerce; the proximity of the site to the waterway; and whether the site is as close to the waterway as is feasible given all of the circumstances in the case.

Herron, 568 F.2d at 141.[5]

---

[4] We have previously addressed situs issues, but have done so without adopting a particular analytical approach.  See Prolerized New England Co. v. Benefits Review Board, 637 F.2d 30, 38-39 (1st Cir. 1980); Stockman v. John T. Clark & Son of Boston, Inc., 539 F.2d 264, 272 (1st Cir. 1976).

[5] The Third Circuit articulated an even more far-reaching approach in Sea-Land Service, Inc. v. Director, Office of Workers' Comp. Programs, 540 F.2d 629, 638 (3d Cir. 1976), concluding that Congress "intended to expand the scope of the LHWCA to provide a

The Fourth Circuit, meanwhile, adheres to a literal reading of the statute. In Sidwell, the court concluded that even general geographical proximity to navigable waters was insufficient to qualify an area as "adjoining," holding that the area must be either "'contiguous with'" or otherwise "'touch[]' such waters." See 71 F.3d at 1138-39. If the area in question is separated from the navigable waters by other areas, the Fourth Circuit stated, it "simply is not 'adjoining' the waters under any reasonable definition of that term." Id. at 1139; see also Jonathan Corp. v. Brickhouse, 142 F.3d 217, 220-22 (4th Cir. 1998).

Both the ALJ and Board took the broader view espoused by the Ninth and Fifth circuits, but nonetheless concluded that the EBMF was not an adjoining area. Cunningham unsurprisingly endorses the "functional relationship" test but asserts that, in applying it, the ALJ failed to weigh all the relevant factors, instead treating

federal workmen's compensation remedy for all maritime employees." The court thus held:

> As long as the employment nexus (status) with maritime activity is maintained, the federal compensation remedy should be available. Resuscitating the situs requirement in cases satisfying the status test will interfere with Congress' intention to eliminate the phenomenon of shifting coverage.

The Supreme Court has observed that the Third Circuit "appears to have essentially discarded the situs test," Caputo, 432 U.S. at 277 n.40, and elsewhere has stated that both elements of the test must be given force, see Herb's Welding, Inc. v. Gray, 470 U.S. 414, 426 (1985). Particularly in light of these comments, we do not believe the Third Circuit test is defensible.

the three-to-four-mile distance between the EBMF and the Bath shipyard as dispositive. The ALJ further erred, Cunningham contends, by limiting himself to examining the EBMF's connection to a single body of water; in Cunningham's view, a strong functional relationship with one navigable waterway may be combined in the calculus of factors with the facility's proximity to another navigable waterway.

Thus, Cunningham asserts that the EBMF qualifies in two ways for LHWCA coverage. First, he contends that the strength of the functional relationship between BIW's main shipyard in Bath and the EBMF outweighs any proximity issue with respect to the navigable Kennebec River. Alternatively, if the Kennebec is deemed to be too far for the EBMF to "adjoin" it, the facility's strong functional relationship with the Bath shipyard, combined with its proximity to the New Meadows River or Thompson Brook, also balances out in favor of coverage. The latter approach implicates Cunningham's claim that the ALJ erred in finding that Thompson Brook is not navigable; he attributes that mistake to the judge's use of the more limited admiralty definition of "navigable," rather than the broader definition applicable to Commerce Clause claims.

Because the ALJ and Board both used the functional relationship test, which provides greater flexibility for a claimant such as Cunningham, and we nevertheless agree with the determination that LHWCA coverage is foreclosed in this case, we

assume, without deciding, that the Herron functional approach is correct.

Applying this functional test, we first confront whether the EBMF is an "adjoining area" in relation to the Bath shipyard and the Kennebec. Our review, of course, is limited to any lingering legal issues and considering whether the Board properly evaluated the ALJ's rulings under the substantial evidence test. The Director of the Office of Workers' Compensation Programs argues that the Board's decision should be vacated and the case remanded to the ALJ because the Board improperly concluded, as a matter of law, that the distance between the EBMF and the Kennebec River foreclosed a finding that the EBMF was an adjoining area.[6] The ALJ never considered the EBMF's relationship to the Kennebec riverfront, and the Director asserts that the ALJ – the designated factfinder – must be given the opportunity to consider in the first instance all relevant circumstances.[7]

We agree with the Board majority that, in light of the undisputed facts and the factual determinations that the ALJ did make, a remand is unnecessary. Moreover, contrary to Cunningham's assertion, the Board did not base its decision simply on the

---

[6] The Director is charged with the administration and enforcement of the LHWCA, see Ingalls Shipbuilding, Inc. v. Director, OWCP, 519 U.S. 248, 262-63 (1997), and also is often a litigant in LHWCA cases as a representative of the Department of Labor, see id. at 269.

[7] One of the three Board members also took this position.

-12-

mileage between the Kennebec River and the EBMF, a rationale that we agree would be insufficient under the test we are applying.[8] The Board carefully reviewed the multiple factors of the Herron test and concluded that the nature of the area between the EBMF and the Kennebec waterfront, in addition to the lack of proximity, compelled the conclusion that the EBMF was outside the perimeter of an "adjoining area" within the meaning of section 903(a).[9]

We find neither legal nor factual error in that conclusion. Although the functional, "just-in-time" relationship between the two locations could hardly be stronger, the key fact is that they are quite clearly two separate locations. Even if, as the Board assumed, East Brunswick was the closest available location for relocating the pipefitting work, it cannot reasonably be viewed as an "adjoining" extension of the shipyard. Rather than sharing an "area" or neighborhood with the main facility, the EBMF is part of a second campus for the shipyard's maritime activities. This is not a matter of mileage. We could imagine a sprawling complex that spans one or more public roadways and incorporates some non-

---

[8] At some point, the distance between a workplace and the navigable waterway may become so large that it is indeed dispositive of the issue. That is not the case here.

[9] On the two other Herron factors, the Board accepted that the facility "may have been built as close as feasible to the main shipyard," see Opinion at 11, and found reasonable the ALJ's conclusion that the EBMF's location was not particularly suited to maritime uses because the prefabrication of pipe systems need not "be performed on or near the water or at a maritime site," id.

maritime uses, but still would qualify as a single continuous extension of the shore. Here, however, the shipyard and the East Brunswick complex are two separate maritime enclaves separated by a large area of mostly unrelated business and residential properties. See Brown v. BIW Corp., 22 BRBS 384 (1989), 1989 WL 245312, *3 (reversing the ALJ after concluding that BIW's Hardings facility, located in the same cluster of buildings as the EBMF, was not an "other adjoining area" under section 903(a), noting that "[t]he administrative law judge placed too much emphasis upon the functional relationship between the Hardings facility and employer's shipyard").

Petitioner has pointed to no case with such an extended view of the concept of "adjoining." We agree that there is no logical basis for distinguishing between the maritime employees at the main shipyard and the similarly occupied employees at the EBMF. Both are engaged in primary maritime activity directly relevant to the shipyard, and both sets of employees thus have the same functional relationship to the navigable waters of the Kennebec. But despite this equivalence, and despite the Supreme Court's admonition to broadly construe the 1972 Amendments, we are not at liberty to ignore entirely the concept of "adjoining." The Supreme Court has confirmed that the "status" and "situs" requirements are separate, see Perini North River Assocs., 459 U.S. at 324 n.32 ("[T]he status requirement is occupational and the situs test is geographic."),

-14-

and we may not "blur together requirements Congress intended to be distinct," Herb's Welding, Inc. v. Gray, 470 U.S. 414, 426 (1985). We thus find no legal error in the Board's conclusion that no matter how much maritime activity takes place at the EBMF, and how many additional BIW buildings surround it, the substantial expanse of unrelated land uses between the main shipyard and East Brunswick forecloses a finding that the one "adjoins" the other.[10]

In so concluding, we emphasize that we are not employing the Fourth Circuit's strict "adjoining" standard or holding that all intervening property must be maritime in nature. Under the

---

[10] The interpretation of "other adjoining area" set forth in the Department of Labor's LHWCA Program Memorandum No. 58, Guidelines for Determination of Coverage of Claims Under Amended Longshoremen's Act (August 5, 1977) ("Guidelines"), is consistent with this analysis. The memorandum describes the relevant "area" as "the entire, overall facility devoted to covered activities." The memorandum continues:

> [I]t does not defeat coverage of a shipbuilder's injury that the precise location where it occurred – for example, a fabrication shop – does not itself adjoin the water; it suffices if the overall area within which it occurred (generally a shipyard) adjoins the water. The relevant "area," in short, is the entire maritime facility involved . . . . [S]uch shipyard areas should be considered to include nearby locations which are in purpose and effect parts of them, even when a fence or public roads physically, but not functionally, separate the location from the shipyard.

Guidelines, at 13-14 (emphasis in original; footnotes omitted).

In our view, the memorandum allows for intervening non-maritime uses outside the perimeter of the main area, but contemplates only such minor interruptions as a fence or adjacent public roads.

functional approach, public roadways or other non-maritime uses that separate the subject workplace from the waterfront will not disqualify the facility from LHWCA coverage. See, e.g., Winchester, 632 F.2d at 513 ("We reject the position that the presence or absence of nonmaritime buildings between the point of injury and the water is an absolute test for whether an injury is covered under the LHWA."). The suitability of the site for maritime use and the unavailability of sites closer to the waterfront are significant considerations, and both factors arguably support petitioner here. Nonetheless, even under the flexible Herron test, for an area to "adjoin" navigable waters, there must be at least some sense of a largely continuous neighborhood of maritime uses, some shape of a perimeter – perhaps broken in spots or irregular in form – that extends out from the water's edge. See Winchester, 632 F.2d at 514, quoted in Sisson v. Davis & Sons, Inc., 131 F.3d 555, 557 (5th Cir. 1998) (a workplace can be said to adjoin navigable waters "so long as the site is close to or in the vicinity of navigable waters, or in a neighboring area").

The Director argues that the concept should embrace a facility that is "functionally part of the shipyard, provided a sufficient geographic nexus exists between the facility and navigable waters." Whether or not a statutory amendment to this effect would improve matters, our view is that it is too much of a stretch for

-16-

"adjoining" to make.  Beyond question, substantial evidence supports the ALJ's implicit finding – and the Board's explicit one – that the necessary geographical connection does not exist between the EBMF and the Kennebec.

As the Board noted, Cunningham argues that the geographic shortcomings between the EBMF and the Kennebec River can be overcome in the functional analysis because the EBMF is near both the New Meadows River and Thompson Brook, the latter of which actually crosses the EBMF property.  Cunningham asserts that both of these waterways are navigable and that their proximity to his workplace, together with the EBMF's functional connection with the Kennebec, qualifies him for coverage under the LHWCA.  All three members of the panel agree that this argument is flawed for reasons fully explained by the ALJ and Board, although two members believe an alternative route to the same outcome is supported by the statutory history and precedent.  See infra n.17.

What is undisputed among the panel members is that substantial evidence supports the ALJ's and Board's determination that Thompson Brook is not navigable and, thus, that its adjacency to the EBMF property can play no role in the Herron functional analysis.  The ALJ and Board correctly determined that the applicable definition of "navigable" derives from admiralty law, see generally Victory Carriers, Inc. v. Law, 404 U.S. 202, 216 (1971); id. at 222-23 (Appendix to Opinion of Douglas, J., dissenting); Nacirema Co. v.

-17-

<u>Johnson</u>, 396 U.S. 212, 215 & n.7 (1969).[11]  For admiralty purposes,

the concept of "navigability" is generally understood to describe

"a present capability of waters to sustain commercial shipping," or

"contemporary navigability in fact," <u>Livingston</u> v. <u>United States</u>,

627 F.2d 165, 169-70 (8th Cir. 1980).  <u>See</u> <u>also</u> <u>Kaiser Aetna</u> v.

---

[11] Cunningham argues that Congress must have enacted the LHWCA under its commerce powers, rather than as an exercise of its power under the maritime clause of the Constitution, and that the broader definition of "navigable" applicable to Commerce Clause cases thus must be used in this context.  This assertion is faulty. In <u>Victory Carriers</u>, issued before the 1972 Amendments to the LHWCA, the Supreme Court noted that Congress had "ample power under Arts. I and III of the Constitution to enact a suitable solution" if it felt that "denying federal remedies to longshoremen injured on land is intolerable," 404 U.S. at 216.  The cases cited in support of that statement make it clear that the Court was referring to Congress's admiralty power. <u>See</u> <u>id.</u> at n.16; <u>see</u> <u>also</u> <u>id.</u> at 222-223 (Appendix to Opinion of Douglas, J., dissenting) (noting that the Court had "clearly acknowledged that Congress' constitutional maritime power does not cease at the shoreline. . . .").
      Although admiralty jurisdiction in tort has traditionally been limited to torts that took place on navigable waters, admiralty contract jurisdiction "'extends over all contracts, (wheresoever they may be made or executed . . .) which relate to the navigation, business or commerce of the sea,'" <u>Johnson</u>, 396 U.S. at 215 n.7 (citation omitted).  Because workers' compensation coverage embraces both tort and contract elements, "Congress need not have tested coverage by locality alone." <u>Id.</u>  Thus, "Congress might have extended coverage to all longshoremen by exercising its power over maritime contracts." <u>Id.</u> at 215.
      We think it evident that in the 1972 Amendments, Congress did exactly what these cases said it had the power to do, namely, used its constitutional maritime authority to extend LHWCA coverage to additional land-based maritime employees who met both the status and situs tests.  Cunningham's contention that the non-exclusive nature of LHWCA relief proves that the statute must be supported by the commerce power is simply incorrect.  State regulation may supplement federal maritime law so long as it is "consistent with federal maritime principles and policies." <u>Yamaha Motor Corp., USA</u> v. <u>Calhoun</u>, 516 U.S. 199, 214-15 & n.13 (1996).

-18-

<u>United States</u>, 444 U.S. 164, 171-72 (noting the varying definitions of "navigable waters" for different contexts); <u>The Robert W. Parsons</u>, 191 U.S. 17, 26 (1903) ("the modern doctrine" is that "the actual navigability of the waters[] is the test of jurisdiction")[12]; <u>Chapman</u> v. <u>United States</u>, 575 F.2d 147, 151 (7th Cir. 1978) (en banc); <u>George</u> v. <u>Lucas Marine Constr.</u>, 28 BRBS 230 (1994), 1994 WL 573753, **4, 6 ("[A] natural or an artificial waterway which is not capable of being used as an interstate artery of commerce because of natural or man-made conditions is not considered navigable for purposes of jurisdiction under the [LWHCA]."), <u>aff'd sub nom.</u> <u>George</u> v. <u>Director, OWCP</u>, 86 F.3d 1162 (9th Cir. 1996) (Table).

---

[12] In defining navigable waters for purposes of admiralty jurisdiction, the Court in <u>The Robert W. Parsons</u> relied in part on the widely quoted definition given in <u>The Daniel Ball</u>, 77 U.S. (10 Wall.) 557, 563 (1870), which addressed Congress's commerce power over navigable waters:

> Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.

This definition appeared in early cases involving both the commerce clause power and admiralty jurisdiction, reflecting an assumption that their scope was coextensive. <u>Adams</u> v. <u>Montana Power Co.</u>, 528 F.2d 437, 440 (9th Cir. 1975). The Supreme Court subsequently clarified that these were two independent sources of power, <u>see</u>, e.g., <u>In re Garnett</u>, 141 U.S. 1, 15 (1891), but, as reflected in <u>The Robert W. Parsons</u>, accepted the "navigable in fact" test as applicable to admiralty jurisdiction.

The ALJ thoroughly reviewed the voluminous evidence submitted on the issue of Thompson Brook's navigability, and the Board in turn endorsed the ALJ's finding of non-navigability based on ample evidence that the waterway is neither presently used for commercial purposes nor adaptable for future commercial use. We see no need to repeat here Cunningham's factual contentions, as our review is limited to ascertaining whether the Board properly applied the substantial evidence test to the ALJ's findings. As the Board noted, the evidence concerning Thompson Brook's physical features ("a narrow, shallow channel of water with many sharp meandering turns"), its lack of current commercial usage, and its location in a "Resource Protection Zone" all point to the reasonableness of the ALJ's conclusion. The Board, additionally, credited the ALJ's finding that Thompson Brook may not be considered an extension of the navigable New Meadows River, and it rejected appellant's contention that Thompson Brook should be deemed navigable based on tidal activity. We find no flaw in these judgments.[13] Thus, the

---

[13] The ALJ found that Thompson Brook is not affected by tidal activity where the brook flows across BIW's property, relying primarily on maps and a survey conducted by an independent consulting firm. The survey was the subject of testimony by BIW's expert, David Kamila, a civil engineer and land use consultant, who also made personal observations of the site. When asked what the survey numbers indicated about the tidal effect on the relevant section of Thompson Brook, Kamila testified that the "numbers tell you that it's above the mean tide for sure." Because the survey showed that the lowest elevation of Thompson Brook's channel in the relevant area was 1.55 feet higher than the average high tide at the brook's mouth (10.9 feet vs. 9.35 feet), and because "the height of the tide diminishes as it travels north," the ALJ

EBMF may not qualify as an adjoining area based on its proximity to Thompson Brook.

The argument that the functional relationship between the EBMF and the Kennebec can be supplemented by the geographic proximity of the New Meadows River, which is indisputably navigable, also founders. The full panel agrees that the <u>Herron</u> analysis does not anticipate aggregating a facility's solely functional relationship with one waterway and its solely geographic proximity to another non-contiguous waterway. Here, the Board endorsed the ALJ's determination that no functional relationship exists between the EBMF and the New Meadows River, and we find no error in that conclusion. The Board relied heavily on the ALJ's finding that, in the Board's words, "EBMF's proximity to the New Meadows River is irrelevant" because "the evidence establishes that employer does not own the intervening property or use the River for any reason."

---

understood Kamila to state that the BIW property was beyond tidal influence. The ALJ thus had ample factual support for his finding.

The Board, citing <u>The Robert W. Parsons</u> and <u>George</u>, stated that "the tidal fluctuations of Thompson Brook are irrelevant" in determining navigability. <u>See</u> <u>The Robert W. Parsons</u>, 191 U.S. at 26 (it is "not the ebb and flow of the tide, but the actual navigability of the waters" that is the test of jurisdiction); <u>George</u>, 1997 WL 573753, at *7 ("[T]he ebb-and-flow test [has] been rejected as the test for determining navigability . . . ."). Whether the "ebb and flow" test retains any vitality remains a matter of discourse, <u>see</u>, <u>e.g.</u>, Mary Garvey Algero, <u>Ebb and Flow of the Tide: A Viable Doctrine for Determining Admiralty Jurisdiction or a Relic of the Past?</u>, 27 Seton Hall L. Rev. 138 (1996), but the ALJ's supportable finding of no tidal influence resolves the issue here.

A workplace that fails the situs test because it is too distant from the navigable water with which it has a functional link is missing a critical element of the calculus; to fill that proximity gap with a second, incidental body of water would extend LHWCA coverage to a much wider range of locations. At least where the second waterway has no functional connection with the employer's maritime activities, we find neither precedent nor logic to support such an extension of the concept of "adjoining area."[14] The Board reached the same conclusion, noting that, under Herron and Winchester, "the site in question must have both a geographic and functional nexus with the same body of water."[15]

Whether the EBMF's relationship with the New Meadows River may, on its own, establish situs under the Herron analysis is a separate question and one to which we now turn. At its closest point, the New Meadows is 1,400 feet from the EBMF property, a distance from navigable waters that reasonably could support a finding of situs if other factors were similarly favorable. Even if the ALJ's findings against petitioner on other of the Herron

----

[14] We note that, when a work location has some functional link with two reasonably proximate waterways, it may be appropriate to look at the Herron factors relating to each of them in combination. This is not that case, and we do not decide the issue here.

[15] Although one Board member wrote a separate concurring and dissenting opinion, he joined the majority on this point.

factors are debatable,[16] however, the lack of a functional link between the EBMF and the New Meadows River overshadows their impact. As the Board noted, "[the] employer, indisputably, does not use the New Meadows River, and thus, that waterway cannot define an area with a functional use related to it."

Because petitioner has failed to establish that the EBMF satisfies the situs requirement in relation to any of the three waterways at issue, he is not entitled to benefits under the LHWCA.

The petition for review is therefore denied.[17]

---

[16] As noted earlier, it is at least arguable that the EBMF location is both suited to maritime uses and as close to the main shipyard as is feasible given all the circumstances in the case.

[17] Although it is not a basis for decision in this case, two members of the panel believe that the lack of a functional link between the EBMF and Thompson Brook may well be the most pertinent rationale for rejecting situs based on their relationship. In their view, section 903(a) implicitly provides that an "adjoining area" covered by the statute must qualify based on its relationship to the navigable water upon which the employer's maritime activity takes place. In other words, situs analysis and the Herron test would come into play only in relation to a body of navigable water on which the employer conducts its primary maritime business. In this case, that would be only the Kennebec River.

The third panel member disagrees both with the propriety of the raising of the theory and with the substance of it. This member believes that a workplace that is literally contiguous to navigable waters is by definition an "adjoining" area under section 903(a); thus, if Thompson Brook were navigable, the EBMF would meet the LHWCA's situs requirement.

In the majority's view, Congress's passage of the 1972 Amendments was a deliberate "march from the sea landward," Triguero v. Consolidated Rail Corp., 932 F.2d 95, 100, ruling out situs where the "'raison d'etre'" of a facility had nothing to do with its fortuitous location near another navigable waterway, see Brickhouse, 142 F.3d at 222. Such a construction would render unnecessary any probing of the navigability of an incidental body of water to determine disability coverage.

-23-